198 N.J. Super. 197 (1985)
486 A.2d 924
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
RICHARD C. MUESSIG, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 15, 1984.
Decided January 16, 1985.
*199 Before Judges KING, DEIGHAN and BILDER.
*200 John M. Fahy, Deputy Attorney General, argued the cause for appellant (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
Michael B. Blacker argued the cause for respondent (Vogel, Vastola & Gast, attorneys Lawrence A. Vastola, Michael B. Blacker and Richard Clayton, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
On this appeal the defendant contends that a three-year mandatory minimum sentence constitutes "cruel and unusual" punishment in violation of the federal and State Constitutions.
This matter has been returned to us following our remand of July 25, 1983 in A-5576-81T4. Defendant was charged in a five-count indictment and pled guilty to official misconduct as a police officer, N.J.S.A. 2C:30-2, and unlawful possession of a revolver with purpose to use it unlawfully against another, N.J.S.A. 2C:39-4a, both second-degree crimes. At his plea hearing defendant admitted participating in financing a scheme to distribute cocaine. He admitted carrying the revolver, in addition to a mace canister, blackjack and knife, for protection during the promotion of the sale of the cocaine.
At the time of the original sentencing, the trial judge observed that the weapon charge was a violation of the so-called "Graves Act," N.J.S.A. 2C:43-6(c), Ch. 31, L. 1981, requiring a mandatory three-year term of incarceration. The judge refused to impose the mandatory term because of defendant's illness, migratory thrombophlebitis, and his vulnerable personal status in a penal institution, because he had been a police officer. Instead he sentenced defendant to "a term of seven years New Jersey State Prison, sentences suspended, probation three years, each count, concurrent with each other. Additional condition  obtain psychiatric treatment." The State appealed pursuant to N.J.S.A. 2C:44-1f(2). We remanded for a plenary hearing on the issue of whether the mandatory custodial sentence constituted cruel and unusual punishment in the circumstance. *201 We placed the burden of persuasion of unconstitutionality upon the defendant by a preponderance of the evidence. See State v. Stanley, 149 N.J. Super. 326, 328-329 (App.Div.), certif. den. 75 N.J. 21 (1977).
The judge reached the same conclusion following a hearing and the State again appealed. We must now consider if the record supports the finding that the Graves Act, as applied to this defendant, amounted to cruel and unusual punishment in violation of the New Jersey and the federal constitutions. See State v. Des Marets, 92 N.J. 62, 82 (1983); N.J. Const. (1947) Art. I, par. 12; U.S. Const., Amend. VIII. In considering this claim we must inquire whether the nature of the punishment is grossly disproportionate to the offense and goes beyond any legitimate penal goal so as to shock the general conscience and violate principles of fundamental fairness. Des Marets, 92 N.J. at 82. Absent such a showing we must respect the legislative will.
We consider the offense most serious. Defendant undertook to engage in distribution of cocaine. He provided money ($5,000) to aid in the establishment of the enterprise and armed himself to protect his interests. He turned on the society that he had been entrusted to protect as a police officer. See In the Matter of Coruzzi, 98 N.J. 77 at 79 (1984). Under ordinary circumstances a three-year minimum term with a maximum of seven years would be most appropriate for punishment and for general and special deterrent purposes. The question here is whether the circumstances of defendant's illness and problems of his personal security within the prison system are so extreme as to constitutionally mandate a judicial exemption from the legislative will. With deference to the considered and thoughtful decision of the Law Division judge, we think an exemption was uncalled for in this case.
At the hearing defendant's witness, Dr. Lewinter, a Board Certified internist, testified that defendant's condition of migratory thrombophlebitis was controllable by an anti-coagulant, Coumadin, but was not curable. It is a rare condition of unknown etiology. Defendant's application for medical retirement *202 because of this disease had been pending at the time of his arrest, when he was on medical leave. Slight trauma presented serious risk either due to hemorrhage or clotting, depending on the blood-thinning process, which could be fatal, or severely disabling. Dr. Lewinter said that defendant was able to participate in physical activities such as walking, swimming and driving an automobile. He was aware of defendant's participation in body-building and weight-lifting and advised against it, but believed it was not a critical point. Defendant's other physician, Dr. Wessler, apparently thought this activity was suitable, at least according to defendant. Dr. Lewinter himself had no first-hand knowledge of specific medical facilities in our State's correctional facilities. He thought that if defendant "goes to prison, given his condition, he's going to get killed."
The State produced two witnesses, Gary Hilton, the Assistant Commissioner of the Department of Corrections, and Allan Koenigsferst, Health and Service Coordinator for the Department. Hilton testified that because of defendant's mandatory minimum sentence of three years he "would have to remain  absent a variance, would have to remain in a closed setting for one-half of the stipulated minimum or one-and-one-half years, and then assuming no other objections, it would probably be reduced to minimum custody and placed in a minimum camp-type of situation." In the event protective custody was indicated, defendant would be placed in a maximum security facility, most likely the new wing of the Trenton State Prison. Some police officers serve their prison terms in protective custody, but not all. Medical considerations are certainly factors in this consideration, as well as the character of the inmate.
From the testimony of Hilton and Koenigsfest, the prison system can without doubt provide adequate medical attention for defendant's illness. They testified that the penal system can "provide whatever level of medical treatment that might be required by almost any person sentenced to us." For *203 example, as of the December 1983 plenary hearing, the state prison system accommodated "a number of paraplegics and one quadraplegic"; some patients were incarcerated with acquired immune deficiency syndrome (AIDS), and others were receiving renal dialysis. The constitutional standard of "deliberate indifference to serious medical needs of prisoners" is not threatened to any extent by the facts before us. Estelle v. Gamble, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).
The sentencing judge was concerned with the ability of the prison system to protect defendant. He found that incarceration would present "a substantial risk that defendant would be seriously hurt or in fact die as a result of possible trauma in connection with his disease causing perhaps fatal results."
Whether the defendant requires solitary or segregated confinement for his own protection during maximum status is an administrative decision. See Bell v. Wolfish, 441 U.S. 520, 547-548, 99 S.Ct. 1861, 1878-1879, 60 L.Ed.2d 447 (1979). We are certain such confinement, if necessary for defendant's protection, will be available. The sentencing judge thought such segregated confinement, if necessary for the first year and one-half when medium security status was required, absent an exception or variance, was "shocking to the conscience of a just society."
Hilton described protective custody as essentially isolation  "22 or so hours or so in a cell"  "maybe an hour a day or so of outdoor or indoor exercise." Meals are eaten in the cell. "Congregate groupings are held to very small members and the members of that congregate function are carefully analyzed in terms of their compatability. In the most secure setting only one person is allowed out at a time." In the cell a prisoner may have a television set, an ice chest, a radio, an electric shaver, a typewriter, books, other personal effects and legal material. Hilton said that in the special protective unit at Trenton's new wing "there would be no random congregate exposure to anyone in that unit, and if they leave that unit, they would be *204 under escort of two officers." Any group contact was allowed only when prisoners "can be matched up as not constituting a threat to one another." See generally N.J.A.C. 10A:31-3.9. Hilton also said that he and the classification personnel would first want to consider "one of our very, very soft camps where we basically have physicians, lawyers and a number of police officers" such as Jones Farm or Clinton, even though a variance from administrative regulations would be required. We gain the clear impression from his testimony that if a variance from medium status for the first 18-months was advisable, it would be granted.
The real substance of the sentencing judge's opinion seems to have been that if defendant was placed in a prison setting, rather than a camp or at Clinton, and chose not to mix with any other inmates in a protective custody environment, it would be cruel and unusual punishment for him "to be kept in a cell 23 hours a day, which amounts to solitary confinement." This assumes that defendant would not be granted an administrative variance and assigned to a "soft" location, i.e. Clinton or Jones Farm, where he would associate with nonviolent, white-collar type criminals. The judge's decision is also susceptible of an interpretation that any prison confinement for defendant in this State involved a substantial risk of serious injury or death. With these conclusions on this record, we disagree.
While a substantially solitary confinement may be harsh, it is not unconstitutional per se. See Hutto v. Finney, 437 U.S. 678, 685-686, 98 S.Ct. 2565, 2570-2571, 57 L.Ed.2d 522 (1978), rehear. den. 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1977). Where conditions of confinement provide for sanitary quarters with access to such amenities as television, radio, reading materials and visitors, segregated confinement virtually around the clock, even for a period of up to eighteen months, is short of cruel and unusual punishment. Hodges v. Klein, 421 F. Supp. 1224, 1236 (1976), aff'd o.b. 562 F.2d 276 (3d Cir.1977).
*205 If defendant receives a variance and is assigned to Clinton or Jones Farm, we do not believe that he will confront life threatening risks to any greater extent than he would in any everyday living environment. If he must go into protective custody while he has a medium security status for 18 months, we cannot on this record conclude that the terms of his confinement would be so harsh as to be cruel and unusual in the constitutional sense. To the extent that conditions of prison confinement "are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (Powell, J.).
We conclude that defendant's equal protection clause attack on the Graves Act, not the subject of a cross-appeal and not raised below, is not properly before us and, in any event, is clearly without merit. Des Marets, 92 N.J. at 73; R. 2:11-3(e)(2).
We reverse and remand for sentencing in conformity with this opinion.