226 N.J. Super. 307 (1988)
544 A.2d 392
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
STEVEN PRATT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 1988.
Decided June 28, 1988.
*308 Before Judges DREIER, BAIME and ASHBEY.
John R. Grele, Assistant Deputy Public Defender, argued the cause for appellant (Alfred A. Slocum, Public Defender, attorney; John R. Grele of counsel and on the brief).
J. Grall Robinson, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; J. Grall Robinson of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Following a lengthy jury trial, defendant, a juvenile whose case had been waived to the adult court, was convicted of *309 murder (N.J.S.A. 2C:11-3), possession of a firearm for an unlawful purpose (N.J.S.A. 2C:39-4a) and possession of a handgun without the requisite permit (N.J.S.A. 2C:39-5b). The trial court imposed sentences aggregating 30 years and ordered that defendant serve the entire term without parole eligibility. In addition, defendant was assessed penalties totaling $550 payable to the Violent Crimes Compensation Board.
On appeal, defendant contends that (1) the trial court committed plain error by not permitting the jury to consider his age in determining whether the homicide was committed in the heat of passion resulting from a reasonable provocation, (2) the defense was incorrectly restricted in presenting evidence concerning the victim's assaultive acts against others and his use of free base cocaine, (3) the prosecutor's summation exceeded the bounds of fair comment, (4) the cumulative effect of these errors denied him a fair trial, (5) he was denied the effective assistance of counsel at the waiver hearing and the referral to the adult court was improper and (6) his sentence constituted cruel and unusual punishment. We have reviewed these contentions in light of the voluminous record and conclude that they are devoid of merit.

I.
In order to place defendant's arguments in their proper context, we are obliged to recount the salient facts in some detail. The sole question presented at trial was whether the crime committed was murder, aggravated manslaughter, reckless manslaughter or voluntary manslaughter. It is undisputed that on October 11, 1984 defendant, who was then 15 years of age, using a handgun he had borrowed from a friend, shot and killed his next door neighbor, Michael Anderson. Uncontradicted evidence was presented disclosing that Anderson was shot in the face and shoulder at relatively close range. As defendant graphically testified at trial, the first time he pulled the trigger "it clicked and it didn't go off" and so he "shot it two more *310 times." The bullet from the first shot pierced the victim's brain and finally lodged in his skull. The second shot was apparently fired as Anderson was collapsing from the mortal wound. The victim died two days later as a result of brain damage.
The trial transcript reveals that the relationship between defendant and Anderson was a good one notwithstanding Pratt's complaint at trial that the victim on occasion acted like his "father." While it would appear that Anderson led a somewhat troubled life, the record does not suggest any confrontations between him and defendant prior to the day of the homicide.
On the afternoon of the shooting, defendant and some of his friends were gathered in the hallway of his apartment building. Because they were making noise, James Glenn, who occupied a second floor apartment, asked them to leave. Apparently, defendant and his friends acceded to this request.
From the noise, Glenn could tell that the group had moved to the next floor. He testified that their laughter and conversation continued for approximately ten minutes. Then Glenn heard Anderson arguing with defendant and his friends, telling them to get away from the door of his apartment and to stop smoking marijuana. After this Glenn heard "banging" and "rumbling" emanating from the hallway. Glenn correctly assumed from these noises that a fight had broken out between Anderson and one or more of defendant's group.
According to defendant's version of the incident, Anderson ordered him and his friends to leave the hallway. In response, defendant asked his mother if they could stay at the Pratt apartment. Being tired, she refused his request, and the group thus returned to the hallway. The dispute between Anderson and the others then resumed. Anderson came out from his apartment and attempted to push one of defendant's friends down the steps. He then pushed defendant, who went to his bedroom, retrieved a lead pipe and returned. After a brief struggle, Anderson took the pipe from defendant and struck *311 him about the face, nose and jaw with his fist. Mrs. Pratt, who had been resting after work and who was roused by the noise, entered her living room where she saw her son lying across the table and Anderson with "his guard up." She did not see Anderson strike her son, and she did not notice any blood on his face or clothing. Mrs. Pratt was able to stop the encounter by directing Anderson to leave her apartment. When defendant complained to his mother that Anderson had punched him, she replied that she would discuss the matter later with the deceased. Defendant then cleaned himself and left the apartment building. Mrs. Pratt subsequently noticed the presence of blood on the switchplate in the bathroom.
Unfortunately, the dispute was halted only temporarily. As defendant left the building, Glenn, who had been listening to the argument, heard him exclaim that he was going to get a "piece" and come back and "shoot" Anderson.
Defendant then met his friend Darnell McClean and told him that Anderson had beaten him up and that he was going to get revenge by shooting him. Defendant asked McClean if he knew where "Breasley" was, because he had a handgun. Breasley was also known as "Timothy Rogers" and "Ali Quan." The two then went off to look for Rogers.
They ultimately found him in front of a neighborhood store which was near the home of Rogers' girlfriend, Denise Hampton. Hampton heard defendant ask Rogers for his gun. Rogers kept the gun at Hampton's house, and, based upon his request, she retrieved it. Rogers' testimony confirmed Hampton's account. According to Rogers, defendant asked him if he had a gun. Defendant told Rogers he was going to "serve" someone. Rogers explained at trial that "serve" was a Muslim expression meaning that the person "served" would "not survive the day."
The point at which Rogers gave the gun to defendant was hotly contested at trial. According to Rogers, he handed the gun to defendant either at Hampton's house or during their *312 walk from Hampton's dwelling to defendant's apartment building. In contrast, defendant testified that the transfer did not take place until the group was in the hallway of his apartment building.
Rogers testified that when they arrived at the apartment building, defendant immediately proceeded to Anderson's apartment and knocked on the door. When Anderson opened it, defendant pulled out the gun and fired the two shots as described earlier. Rogers' account was consistent with Glenn's, who heard a knock on Anderson's door, which was followed by gunshots.
Defendant's account differed. Defendant explained that the transfer of the weapon took place at the apartment building. He claimed to have no knowledge of the fact that Rogers had a gun until the group was standing by the stairwell. Once there, Rogers pulled the gun out of his waistband and gave it to defendant, who then returned it. Rogers opened the gun, loaded it and placed it back under his waistband.
According to defendant, he then proceeded up the stairs and knocked on Anderson's door. When Anderson appeared, defendant asked if he remembered their earlier fight. Although Anderson did not respond, defendant claimed that a struggle immediately ensued.
Defendant then turned and walked downstairs, obtained the gun from Rogers and returned to the third floor landing. Anderson was still standing in the doorway. Defendant testified that he pointed the gun at Anderson, but "it just clicked." Anderson laughed briefly, at which point defendant "shot two more times." Defendant saw Anderson bend over after the first successful firing of the gun. Nevertheless, defendant pulled the trigger again.
At trial defendant claimed that he did not know whether the bullets he saw Rogers place in the gun were real or fake. However, he admitted that in the several versions of the shooting that he gave to the police, he never mentioned the fact *313 that he thought the bullets were fake or blank. The only explanation offered at trial for his uncertainty as to whether the bullets were real was that he had never seen Rogers with a gun before and that he himself "wasn't into no real bullets or guns...." Defendant admitted he never asked Rogers about the bullets.
The first officer on the scene found Anderson lying on the floor of the entranceway of his apartment, leaning against the door. His feet were adjacent to the outside of the doorway. The police found narcotics paraphernalia in Anderson's apartment. In that respect, Anderson's girlfriend admitted that he had used cocaine on the day of the shooting.
Later that evening, defendant, accompanied by his mother, came to police headquarters for questioning. He first denied any knowledge of the shooting, but then credited a man from New York named "Rasheed" with the murder. Defendant subsequently retracted that claim and then blamed the homicide on Robert Tinsley. Upon further questioning, defendant admitted that this too was a lie. Defendant ultimately told the police that Rogers had fired one of the two shots and that he had fired the other. The final statement was tape recorded.
Rogers eventually led the officers to the gun. The State presented expert testimony revealing that bullets retrieved from Anderson's body at his autopsy were found to have been fired from the gun Rogers surrendered. The gun had a "heavy pull," not a "hair" trigger, and could not be fired easily.
At the time of the shooting, Anderson was five feet, 10 inches tall and weighed approximately 165 pounds. Defendant was five feet, 11 inches tall, but weighed less than Anderson. Defendant's nose was swollen when he was admitted to Harborfields Juvenile Center on the day after the homicide. However, he showed no other signs that he had been beaten by Anderson the day before.
As to the homicide charge, the trial court instructed the jury on the crimes of murder, aggravated manslaughter, reckless *314 manslaughter and voluntary manslaughter. As noted previously, the jury found defendant guilty of murder, possession of a firearm for an unlawful purpose and possession of a handgun without the requisite permit. This appeal followed.

II.
We first address defendant's argument that the trial court erroneously refused to permit the jury to consider his age in determining whether the homicide was committed in the heat of passion resulting from a reasonable provocation. The issue is raised in the following procedural setting. In his opening statement to the jury, defense counsel repeatedly referred to defendant's age, suggesting that his client's youth was to be considered in deciding whether he had acted under reasonable provocation. Despite the prosecutor's vigorous objections, no curative instructions were requested and none was given at that point. Prior to summations, however, the prosecutor again raised the issue and submitted a request to charge, stating in essence that an objective test was to be applied. In the ensuing colloquy, the prosecutor urged that "provocation must be such as... would probably throw the mind of an average man of ordinary self-control into a state of rage or anger." In response, defense counsel agreed that, to reduce the crime from murder to manslaughter, the provocation must be so gross as to cause an "ordinary reasonable man" to lose his self-control and to "use violence with fatal results." In addition, defense counsel expressly conceded that the instructions embodied in the prosecutor's request to charge "fairly cover[ed] the law" and should be given to the jury. Based upon that concession, the prosecutor, in the course of his summation, commented that the question before the jury was whether the conduct of the victim was such as to be capable of causing an "average ordinary individual  not the average fifteen-year-old  to lose his self-control." Thereafter, in its principal instructions, the trial court stated that the jury was to apply an objective test in resolving the question of reasonable provocation, i.e., whether *315 the provocative acts of the deceased were such as "would probably throw the mind of an average man of ordinary self-control into a state of uncontrolled rage or anger." Again, defense counsel objected neither to the prosecutor's comment nor to the trial court's charge.
In this appeal, however, defendant argues that the objective standard applied at trial suffers from a certain sterility and fails to recognize that youthful individuals are often incapable of exercising the same degree of self-control as adults. He contends that it is both feasible and appropriate to apply a special standard to children, because their normal condition is one of incapacity and the state of their progress toward maturity is reasonably capable of determination. It is thus argued that the age of the accused should be considered by the jury in assaying whether the deceased's conduct was reasonably provocative and was such as to cause a loss of self-control with the consequent use of violence and fatal results.
Preliminarily, we consider the threshold issue whether the argument advanced by defendant is cognizable on appeal. As we have taken pains to stress, defense counsel not only failed to object to the prosecutor's comment and the trial court's charge, he expressly concurred in their view of the law pertaining to reasonable provocation. The error belatedly asserted here was thus induced, encouraged and acquiesced in by defendant's trial counsel. Ordinarily, "[t]he defendant cannot beseech and request the trial court to take a course of action, and upon adoption by the [judge], take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." State v. Pontery, 19 N.J. 457, 471 (1955). See also State v. Ramseur, 106 N.J. 123, 281-282 (1987); State v. Talley, 94 N.J. 385, 391 (1983); State v. Simon, 79 N.J. 191, 205 (1979); State v. Miscavage, 62 N.J. 294, 299-300 (1973). In cases of invited error, the question is whether the trial derelictions "cut mortally into the substantive rights of the defendant" and were so egregious and of such magnitude as to *316 "trench directly upon the proper discharge of the judicial function." State v. Harper, 128 N.J. Super. 270, 277-278 (App.Div. 1974), certif. den. 65 N.J. 574 (1976). Accordingly, situations in which the conduct of the defense counsel arguably induced error "call for `a close, balancing examination of the nature of the error, its impact on the ... jury's verdict and the quality of defendant's motives....'" State v. Corsaro, 107 N.J. 339, 346 (1987), quoting State v. Harper, supra, 128 N.J. Super. at 278.
While we harbor serious reservations whether the error alleged by defendant was capable of producing an unjust result, R. 2:10-2, we need not dwell upon the subject. We are entirely satisfied that the trial court's instructions correctly apprised the jury of the law pertaining to reasonable provocation and that the prosecutor's remarks on the subject were not improper.
Current principles mitigating murder to manslaughter have their genesis in the sixteenth and seventeenth centuries common law of England. Originally, a homicide accomplished in furtherance of a deliberate, premeditated intent to kill formed an appreciable time beforehand constituted murder, while a killing committed without a preconceived plan was manslaughter. See State v. King, 37 N.J. 285, 300 (1962). Later, however, the law, "while retreating from its sixteenth century absolution of the killer `on a sudden' [impulse], recognized the frailties of man and ameliorated the punishment for a homicide by the nature of its moral character." Ibid., quoting 3 Stephen, History of the Criminal Law of England, 71 (1883). Over the years, the concept of reasonable provocation developed. In order to reduce murder to manslaughter, it was said that the homicidal act must be occasioned by a provocation "so gross as to cause the ordinary reasonable man to lose his self control and to use violence with fatal results." Ibid. So too, it was stated that the defendant must "in fact" have been deprived of his self-control under the stress of such occasion, thereby causing him to commit the crime under its sway. Ibid. Our earlier cases in New Jersey thus spoke of a killing occurring *317 during the heat of passion resulting from a reasonable provocation, a passion which effectively deprived the killer of the mastery of his understanding, a passion which was acted upon before a time sufficient to permit reason to resume. See, e.g., State v. Agnesi, 92 N.J.L. 53 (Sup.Ct. 1918), aff'd 92 N.J.L. 638 (E. & A. 1919); Brown v. State, 62 N.J.L. 666 (E. & A. 1899); State v. Zellers, 7 N.J.L. 220 (Sup.Ct. 1824).
The point to be stressed is that in drawing a line between murder and manslaughter, there was no purpose to subject others to harm at the hands of those easily provoked and subjectively prone to violence. On the contrary, the aim of the law was to protect the innocent from mortal attack by the psychologically sick or immature who are unable to exercise normal self-control as well as by those motivated by evil. The rule condemned by some as ancient and unrealistic was designed to accord as great a measure of protection and security to society as the exigencies and complexities of circumstances permit. The objective standard of reasonable provocation thus recognized the need for legal controls to protect society from grievous anti-social acts. The thesis was, and continues to be, that a homicide may be "attributable to the heat of blood rather than to malice," and "in ultimate terms it represents a fair concession" to the weaknesses of human beings. State v. Williams, 29 N.J. 27, 42-43 (1959). See also State v. Guido, 40 N.J. 191, 209-210 (1963). Suffice it to say, however, we perceive nothing in the common law underpinnings of the current doctrine suggestive of a design to abandon concerns of public security on the basis of the subjective perceptions and self-constraints of the individual.
These public policy considerations were addressed by our Supreme Court in State v. McAllister, 41 N.J. 342 (1964). There, the Court was asked to adopt a rule which would have permitted evidence of a defendant's mental and emotional defects to be introduced and used by the jury on the issue of provocation. Id. at 352. The defendant argued that his emotional impairment, which reduced him to an intellectual age of *318 less than seven years, should have been taken into account by the jury because "it takes less stimulus to adequately provoke such a person than that amount which would be necessary to sufficiently provoke an adult mind." Ibid. Noting the common law roots of the murder-manslaughter distinction, the Court reiterated the principle that "[t]he provocation which ... reduces a homicide... must be such as is calculated to produce hot blood or passion in a reasonable man, an average man of ordinary self-control." Id. at 353, quoting Weihofen and Overholser, "Mental Disorder Affecting the Degree of Crime," 56 Yale L.J. 959, 969 (1947). It was said that unless the provocation met this objective standard of reasonableness, "the subjective fact of passion does not make the killing manslaughter." Ibid. Thus, the Court rejected the proffered thesis which would have made the criterion entirely a subjective test of the actual effect of the action of the deceased upon the mind of the particular person charged with his homicide. Ibid.
Despite periodic attacks upon the efficacy of the objective standard of reasonable provocation, these principles were carried over when our Legislature enacted the Code of Criminal Justice. As originally drafted, the New Jersey Penal Code provided that in determining the question of provocation necessary to mitigate murder to manslaughter, the reasonableness of the actor's explanation or excuse would "be determined from the viewpoint of a person in [his] situation under the circumstances as he believes them to be." The New Jersey Penal Code, Final Report of the New Jersey Law Revision Commission, Vol. I at 51, § 2C:11-4(a)(2). The object of the drafters' proposal was articulated in the following terms:
[T]he formulation seeks to qualify the rigorous objectivity of the prevailing law insofar as it judges the sufficiency of provocation by its effect on the reasonable man. To require, as the rule is sometimes stated, that the provocation be enough to make a reasonable man do as the defendant did is patently absurd; the reasonable man quite plainly does not kill. But even the correct and the more common statement of the rule, that the provocative circumstance must be sufficient to deprive a reasonable or an ordinary man of self-control, leaves much to be desired since it totally excludes any attention to the special situation of the actor.

*319 Though it is difficult to state a middle ground between a standard which ignores all individuals' peculiarities and one which makes emotional distress decisive regardless of the nature of its cause, we think that such a statement is essential. For surely if the actor had just suffered a traumatic injury, if he were blind or were distraught with grief, if he were experiencing an unanticipated reaction to a therapeutic drug, it would be deemed atrocious to appraise his crime for purposes of sentence without reference to any of these matters. They are material because they bear upon the inference as to the actor's character that it is fair to draw upon the basis of his act....
We submit that the formulation in the Code affords sufficient flexibility to differentiate between those special factors in the actor's situation which should be deemed material for purposes of sentence and those which properly should be ignored. We say that there must be a "reasonable explanation or excuse" for the extreme disturbance of the actor, and that the reasonableness of any explanation or excuse "shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be." There will be room, of course, for interpretation of the breadth of meaning carried by the word "situation," precisely the room needed in our view. There will be room for argument as to the reasonableness of the explanations or excuses offered; we think again that argument is needed in these terms. The question in the end will be whether the actor's loss of self-control can be understood in terms that arouse sympathy enough to call for mitigation in the sentence. That seems to us the issue to be faced. [Final Report, Vol. II., at 163-164].
It is to be emphasized that the proposal was rejected by the Legislature. The Code as enacted retains the common law objective standard and provides that criminal homicide constitutes manslaughter only when "committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4b(2). See State v. Crisantos (Arriagas), 102 N.J. 265, 281 (1986); State v. Grunow, 102 N.J. 133, 140-141 (1986). The Legislature's rejection of the drafters' proposed change of the law comported with its refusal to adopt a subjective standard with reference to the justification of self-defense and defense of others. See State v. Bowens, 108 N.J. 622, 630-631 (1987). In both cases, the common law's predilection to judge all conduct by that of a reasonable man or woman was retained. Id. at 631. See also State v. Kelly, 97 N.J. 178, 199 (1984).
We do not suggest that the age of the actor can never be considered in determining the issue of reasonable provocation. There may be cases in which a child's age may connote a general inability to combat a course of ill treatment, thereby *320 inducing a homicidal response in a person of ordinary firmness. Perhaps, age might be a circumstance in a course of prolonged oppression, for we do not doubt the capacity of a series of events to accumulate a detonating force having the capacity to overwhelm the reason of an ordinary person. See State v. Guido, supra, 40 N.J. at 211. We leave resolution of that question to another day. Suffice it to say that here defendant's age had no particular relevance or bearing on the issue of whether the conduct of the deceased would have prompted a homicidal rage in a reasonable person.
We merely emphasize the limited parameters of defendant's argument, and, hence, the narrow contours of our holding. Specifically, we hold that the diminished ability of children to exercise reasonable self-control cannot be considered in determining whether a criminal homicide was committed in the heat of passion resulting from a reasonable provocation. Assuming the accuracy of the predicate to defendant's argument, i.e., youthful offenders are particularly prone to violence, such volatility should not be considered by the fact-finder in deciding whether a killing constituted murder or voluntary manslaughter. The legitimate demands of law enforcement and public security would be subverted were we to exempt what defendant himself characterizes as the most volatile individuals from the commands of the law.[1] Perhaps, it may be true that impulsivity is an ingredient inherent in the nebulous adult-child world of a 15-year-old. So too, it is arguable that punishment has less of a deterrent effect upon volatile adolescents. See State in the Interest of C.A.H. & B.A.R., 89 N.J. 326, 335 n. 1 (1982). Conversely, it may be said that strict punishment in such circumstances will be a vicarious penal lesson to other similarly disposed persons, who will be deterred from engaging in violent *321 criminal acts. Ibid. In any event, the tension between these seemingly irreconcilable and competing public policy considerations can best be addressed and alleviated at the waiver hearing. See State v. R.G.D., 108 N.J. 1, 14 (1987).
In sum, we decline defendant's invitation to modify the well-established standard for determining reasonable provocation. We have no roving commission to broaden the law and deviate from the clearly expressed legislative intent. In sum, we find that no error was committed at the trial level, and that defendant was correctly held to an adult standard of self-control. Cf. Goss v. Allen, 70 N.J. 442 (1976), where in a civil setting an adult standard of care was said to be applicable to a minor who engages in hazardous activities. Id. at 447.

III.
We next turn to defendant's argument that the trial court improperly restricted the defense by precluding it from presenting evidence to show the turbulent and quarrelsome character of the deceased. More specifically, the trial court barred defendant from presenting evidence that the victim was addicted to free base cocaine, was often intoxicated, had been dismissed from his position with the Atlantic City Fire Department and had on separate occasions assaulted his, the victim's, father and girlfriend. It is argued that defendant's knowledge of the victim's assaultive character and his generally ruinous circumstances was probative with respect to the question of reasonable provocation. We disagree.
At the outset, we note that defendant's proffer at trial was largely ambiguous. It does not appear that defendant, at the time of the homicide, was aware of Anderson's allegedly violent nature. Indeed, as we have pointed out in our recital of the facts, defendant testified that he enjoyed a good relationship with Anderson prior to the date of the shooting and generally thought well of him. To that extent, it would appear that the defense did not satisfy the foundational prerequisite to admission *322 of evidence concerning the victim's reputation for violence. As we said in State v. Burgess, 141 N.J. Super. 13 (App.Div. 1976), "at the very least it must be demonstrated that defendant had knowledge of the `victim's' reputation for aggressiveness." Id. at 16. "[A]bsent proof of defendant's knowledge of the [deceased's] pugnacious reputation, evidence thereof will not be admitted." Ibid. This requirement makes much sense since in the context of a claim of reasonable provocation an assertion that defendant's actions were influenced or prompted by the victim's aggressive reputation has little significance if the accused was actually unaware of this fact. Here, there was no such showing.
Beyond this, our courts have generally prohibited admission of specific instances of misconduct to establish the turbulent character of the deceased where the deceased's conduct was in issue. See, e.g., State v. Conyers, 58 N.J. 123, 133 (1971); State v. Roscus, 16 N.J. 415, 425 (1954); State v. Mondrosch, 108 N.J. Super. 1, 4-5 (App.Div. 1969), certif. den. 55 N.J. 600 (1970). It has been said in that respect that Evid.R. 47 "settles [the] issue; it expressly provides that `[s]pecific instances of conduct not the subject of a conviction of a crime shall be inadmissible.'" State v. Conyers, supra, 58 N.J. at 133; State v. Mondrosch, supra, 108 N.J. Super. at 4-5. Although the issue is presented here in a slightly different context, we perceive no justifiable basis to disturb the trial court's evidentiary decision. While we recognize that Evid.R. 47, read literally, refers solely to character evidence offered to prove conduct on a specific occasion, the policy considerations underlying the principle are equally applicable here. See Evid.R. 55. In the context of the minimal probative value of the proffered evidence, we will not reverse on this basis. Cf. Evid.R. 4.
We thus conclude that the trial court did not err when it excluded the proffered evidence. Even were it otherwise, however, we would find the error harmless in the context of the entire record. The deceased's aggressive propensities were amply demonstrated by the defense through admission of other *323 evidence. Assuming that error was committed, we are entirely satisfied from our examination of the trial transcript that defendant's right to a fair trial was not compromised.

IV.
Defendant's remaining arguments pertaining to the conduct of the waiver hearing and the trial are clearly devoid of merit and do not require extended discussion. R. 2:11-3(e)(2). We merely note that the evidence of guilt presented by the State can fairly be characterized as overwhelming. Indeed, the record reeks of defendant's guilt of the crimes charged in the indictment.
Initially, we find nothing in the prosecutor's summation which exceeded the bounds of fair comment. We note that a prosecutor is entitled to sum up the State's case graphically and forcefully. It cannot be expected that criminal trials will be conducted without some show of feeling. Defense counsel traditionally make dramatic appeals to the emotions of the jury. In these circumstances, "a prosecutor cannot be expected to present the State's case in a manner appropriate to a lecture hall." State v. Johnson, 31 N.J. 489, 510-511 (1960). In appropriate cases, our courts have not hesitated to find reversible error due to prosecutorial misconduct. See, e.g., State v. Johnson, 65 N.J. 388, 391 (1974); State v. Spano, 64 N.J. 566, 567 (1974); State v. West, 29 N.J. 327, 338 (1959); State v. Thomas, 168 N.J. Super. 10, 13 (App.Div. 1979); State v. Stewart, 162 N.J. Super. 96, 100-101 (App.Div. 1978); State v. Kenny, 128 N.J. Super. 94, 110-111 (App.Div. 1974), aff'd 68 N.J. 17 (1975). Suffice it to say, we find no impropriety here.
Equally unpersuasive is defendant's challenge to the Family Part's decision to refer his case for adult prosecution. Our thorough examination of the record discloses that defendant was not denied the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), reh'g den. 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d *324 864 (1984). It cannot fairly be said that counsel's performance was deficient or that his derelictions or errors were so serious as to deprive defendant of a fair hearing. State v. Fritz, 105 N.J. 42 (1987). So too, we find ample support in the record for the Family Part's ultimate determination waiving defendant to the adult court pursuant to N.J.S.A. 2A:4A-26. See State v. R.G.D., supra, 108 N.J. at 15. Specifically, the court's findings of fact were grounded in competent, credible evidence; correct legal principles were applied and the conclusion reached was reasonable and does not shock the judicial conscience. Ibid. While we are not insensitive to the consequences attributable to a decision waiving juvenile jurisdiction in a case involving a charge of murder[2], id. at 14 n. 6, we find no abuse of discretion here.

V.
Finally, we reject defendant's argument that his sentence for murder constituted cruel and unusual punishment. Of course, we acknowledge that the sentence was harsh. Pursuant to N.J.S.A. 2C:11-3b, a person convicted of murder must serve at least 30 years without parole. In State v. Johnson, 206 N.J. Super. 341 (App.Div. 1985), certif. den. 104 N.J. 382 (1986), we upheld this provision in the face of a claim that the mandatory nature of the penalty was facially violative of federal and state constitutional safeguards against infliction of cruel and unusual punishment. Id. 206 N.J. Super. at 348. While that decision pertained to the sentencing of an adult, many of the same considerations which impelled our conclusion are equally applicable here.
The broad power to determine punishment for the commission of crimes is committed to the legislative and not the *325 judicial branch of government. See State v. Hampton, 61 N.J. 250, 273 (1972); State v. Smith, 58 N.J. 202, 211 (1971). As a general rule, the courts are obliged to follow and apply the legislative command. As expressed by our Supreme Court in State v. Smith, supra, the judiciary "will not interfere with the prescribed form of penalty unless it is so clearly arbitrary and without rational relation to the offense or so disproportionate to the offense as to transgress ... constitutional boundaries." Id. at 211. In making this determination, the courts must consider "whether the nature of the criticized punishment is such as to shock the general conscience and to violate principles of fundamental fairness; whether comparison shows the punishment to be grossly disproportionate to the offense; and whether the punishment goes beyond what is necessary to accomplish any legitimate penal aim." State v. Hampton, supra, 61 N.J. at 273-274. Absent such a showing the judiciary must respect the legislative will.
Against that backdrop, we reject defendant's argument that the statutorily mandated 30-year custodial term is unconstitutional because it fails to accord individualized sentencing treatment to juveniles. In support of this proposition, defendant cites Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), reh'g den. 429 U.S. 890, 97 S.Ct. 248, 50 L.Ed.2d 173 (1976). These decisions are plainly inapposite, however. In both Woodson and Roberts, the Supreme Court mandated individualized sentencing procedures only for capital cases since the death penalty was viewed as "qualitatively different from a sentence of imprisonment." Woodson v. North Carolina, supra, 428 U.S. at 305, 96 S.Ct. at 2991, 49 L.Ed.2d at 961. "[D]eath as a punishment is unique in its severity and irrevocability," Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859, 882 (1976), and, thus, "`decisions [in] capital cases are of limited assistance in deciding the constitutionality of the punishment' in a noncapital case." Solem v. Helm, 463 U.S. 277, 289, 103 S.Ct. 3001, 3009, *326 77 L.Ed.2d 637, 649 (1983), quoting Rummel v. Estelle, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382, 390 (1980). See also State v. Corbitt, 74 N.J. 379 (1977), aff'd 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978).
We note that mandatory sentencing schemes not allowing for consideration of individualized factors have withstood judicial scrutiny.[3]See, e.g., State v. Des Marets, 92 N.J. 62, 81-82 (1983); State v. Corbitt, supra, 74 N.J. at 397; State v. Smith, supra, 58 N.J. at 212; State v. Johnson, supra, 206 N.J. Super. at 346-347; State v. Gantt, 186 N.J. Super. 262, 272 (Law Div. 1982), aff'd 195 N.J. Super. 114 (App.Div. 1984), aff'd 101 N.J. 573 (1986); State v. Fearick, 132 N.J. Super. 165, 170 (App.Div. 1975), aff'd 69 N.J. 32 (1976). While our research has disclosed no reported New Jersey decision pertaining specifically to juveniles, we observe that public concern about unrehabilitated, violent youthful offenders has "stimulated a `just deserts' approach to juvenile crime." State v. R.G.D., supra, 108 N.J. at 8, citing Zenoff, "Controlling the Dangers of Dangerousness: The ABA Standards and Beyond," 53 Geo. Wash.L.Rev. 562, 604 n. 251 (1980) and Zenoff & Zients, "Juvenile Murderers: Should the Punishment Fit the Crime?," 2 Int'l J.L. & Psychiatry 533, 536 (1980).
Within this conceptual framework, we find no constitutional impediment barring imposition of the mandatory 30-year sentence on juveniles whose cases have been waived to the adult court and who have been found guilty of murder. Recognizing that "[m]urder is the most heinous and vile offense proscribed by our criminal laws," State v. Serrone, 95 N.J. 23, 27 (1983), it cannot fairly be said that the punishment "violates principles of *327 fundamental fairness," is "grossly disproportionate" to the seriousness of the offense or "goes beyond what is necessary to accomplish any legitimate penal aim." See State v. Des Marets, supra, 92 N.J. at 82. See also State v. Ramseur, supra, 106 N.J. at 169; State v. Muessig, 198 N.J. Super. 197, 201 (App.Div. 1985), certif. den. 101 N.J. 234 (1985).[4]

VI.
Accordingly, the judgment of conviction is affirmed.
NOTES
[1] We note the increase of violent crime committed by juveniles, particularly in urban areas. A study of the six most populated cities in New Jersey reveals that 43% of juvenile arrests were for violent offenses, including murder, rape and robbery. Juvenile Delinquency Commission Clearinghouse (April 29, 1988).
[2] Cf. State in the Interest of A.B., 109 N.J. 195 (1988) holding that N.J.S.A. 2A:4A-44(c)(2) which prohibits the incarceration of developmentally disabled juvenile offenders in State correctional facilities does not bar waiver of these juvenile offenders to adult court.
[3] The Legislature most recently considered this subject when it enacted N.J.S.A. 2C:11-3g. That statute states that "[a] juvenile who has been tried as an adult and convicted of murder shall not be" subject to the death penalty, but "shall be sentenced in accordance with subsection b," which provides for a mandatory 30 year parole ineligibility term. Thus, the Legislature clearly intended that the 30 year minimum term be applied to juveniles, and we discern no justifiable basis to question that judgment.
[4] Defendant's argument that some penalties as applied to juveniles have been held unconstitutional while the same penalties applied to adults have been upheld as constitutional is without merit. The cases cited by defendant involved the imposition of life imprisonment without parole eligibility and, thus, are factually distinct from the instant appeal. See, e.g., Anderson v. Com., 465 S.W.2d 70 (Ky.Sup.Ct. 1971); Workman v. Com., 429 S.W.2d 374 (Ky.Sup.Ct. 1968); People v. Marsh, 36 Cal.3d 134, 202 Cal. Rptr. 92, 679 P.2d 1033 (Sup.Ct. 1984).