256 N.J. Super. 390 (1992)
607 A.2d 179
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EDWARD JAMES ABRAMS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 24, 1992.
Decided May 19, 1992.
*392 Before Judges ANTELL, LONG and BAIME.
*393 Wilfredo Caraballo, Public Defender, attorney for appellant (Theodore E. Kyles, Jr., designated counsel and on the brief).
Robert J. Del Tufo, Attorney General of New Jersey, attorney for respondent (Tanya Y. Justice, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
After a trial by jury, defendant was convicted of aggravated manslaughter, N.J.S.A. 2C:11-4a, as a lesser included offense of murder, N.J.S.A. 2C:11-3a(1) and (2), possession of a weapon (shotgun) for an unlawful purpose, N.J.S.A. 2C:39-4a, and conspiracy to commit murder, N.J.S.A. 2C:11-3a(1) and N.J.S.A. 2C:5-2. The conviction for possession of a weapon was merged into the conviction for aggravated manslaughter, and on those merged offenses defendant was sentenced to a custodial term of 30 years with a 15-year period of parole ineligibility. For the conspiracy conviction defendant was sentenced to a consecutive custodial term of 15 years with a 7 1/2-year period of parole ineligibility. Defendant now appeals, alleging error in the trial court's denial of his motion to suppress his confession, insufficiency of evidence to support the conspiracy conviction, error in the exclusion of evidence, error in the court's refusal to charge the lesser included offense of reckless manslaughter and a mistaken exercise of discretion in the imposition of sentence.
At around 1:45 a.m. on November 28, 1987, Leonard Jones and his wife, Dawn, were dropped off at their home on Butler Road in Franklin Park, by their friends, the Rudolphs, with whom they had attended Leonard's 20th high school reunion. Leonard walked to his Bronco, which was parked in the driveway, and searched for a remote control garage door opener which he kept in that vehicle so that he could enter his house through the garage. Not finding it, he walked to the garage door and prepared to open it with a key. At the sound of a shotgun blast which narrowly missed him, he shouted "Someone *394 shot at me!" and ran around to the rear of the Bronco. As he did, a second shot was fired and Leonard fell to the ground, screaming "I've been hit in the back, I've been hit!" Unable to enter her own house, Dawn hysterically ran next door to the house of her sister, Rayne Stryker, to call for help. From within Rayne's house she heard a third explosion. When Dawn and her brother-in-law, Garrie Stryker, reached Leonard's side he was heard saying "Garrie, I'm dying, I'm dying." He then fell silent and his self-prognosis was quickly fulfilled.
The Franklin Park police who arrived at the scene found Leonard lying in a pool of blood. They attempted first aid, but his heart was no longer beating and there was no respiration. He was pronounced dead on arrival at Princeton Medical Center.
On his way to the scene, Franklin Park Police Officer Joseph Sierotowicz observed a van speed past him on South Middlebush Road. He turned around, and after a short chase he overtook the vehicle and ordered the driver out. During the weapons patdown that followed, a black remote control garage door opener fell out of the driver's chest pocket. The driver had no driver's license, registration, insurance card or other identification, but he identified himself as defendant, Edward James Abrams, and stated that he lived a short distance away. He explained his presence in the area by saying that he had fought with his family earlier and was simply riding around. Inside the van, Officer Sierotowicz saw a zippered gun case lying next to the driver's seat. The case contained a 12-gauge, double-barrel shotgun for which defendant could not produce any authority to carry.
Officer Craig Novich, who was also en route to the scene, stopped to assist Officer Sierotowicz. Then, leaving Sierotowicz on the road with defendant, Officer Novich went to the crime scene and learned that the victim had been killed with a shotgun. After this information was transmitted to Sierotowicz *395 defendant was taken to Police Headquarters for questioning.
The interview at Headquarters took place between 3:20 and 3:40 a.m. Although defendant at first denied any involvement in the shooting, he agreed to accompany the detectives to the Somerset County Prosecutor's Office for a polygraph examination. While waiting for the polygraph examiner to prepare for the examination, defendant stated to the police that he was willing to discuss his involvement in the homicide. Thereupon, commencing at 6:31 a.m., defendant gave a tape-recorded confession in question-and-answer form which was completed at 7:20 a.m. The statement was followed later that morning by a detailed reenactment of the crime which was recorded with a video camera between 10:19 a.m. and 11:24 a.m.
At the time of the homicide, defendant was 19 years old. According to his statements, he had been carrying on a sexual relationship with Dawn Jones for a year and a half and believed that he was in love with her. Dawn was 33 and, approximately 10 years earlier, had acted as defendant's baby sitter. Defendant told the police that he killed Leonard because he wanted his wife. He explained that he believed Dawn was going to the class reunion with Leonard against her will and that Dawn's sister, Rayne, had told him that Leonard and Dawn would probably have sexual relations when they returned home.
According to defendant's statement, he drove to the Jones' neighborhood and parked his van in a forested area at around 11 p.m. Carrying his shotgun and with three slug shells in his pocket, he walked through the woods and climbed a seven-foot fence into the Jones' back yard. Knowing that the Jones' kept a remote control garage opener in the Bronco which was parked behind the house, defendant took it out of the vehicle and placed it in his pocket. He noted that he used his shirt to close and open the door so that he would leave no fingerprints. His reason for taking the remote controller was so "that they would not be able to get into the house as fast as, as they normally *396 would. That would give me more time to, to set, to set myself up to what I was about to do." He then waited in the cold and the rain for approximately 2 1/2 hours.
When defendant heard the couple leaving the Rudolphs' car, he put two shells into his gun and pushed the safety up. As defendant anticipated, after he unsuccessfully searched for the remote controller Leonard walked towards the garage door "and that's when I took the first shot and I do believe I missed because he, he didn't say he was hit, he said someone shot at me." When Leonard ran for shelter defendant fired again, this time hitting his victim squarely in the back. The first two shots were fired at a distance of between 15-20 yards. The final shot was fired after Dawn ran into her sister's house for help. Defendant was then standing "[p]robably around about five feet" from Leonard who was lying on the ground unable to move. In reply to the interrogating officer's question, defendant stated "[m]y intent was, was to kill him." He then fled to his waiting van.
Defendant's contention that the State failed to satisfy the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), has no merit. The record is clear that before beginning their questioning the police clearly apprised defendant of his rights, and that defendant acknowledged in writing that he had been advised thereof. He was reminded of those rights and they were read to him again before the tape-recorded statement began at 6:31 a.m. Defendant again acknowledged that he was aware of them. Although the Miranda warning does not appear to have been repeated just prior to the video reenactment later that morning, it was fresh in his mind and the Supreme Court has said "[o]nce a defendant has been apprised of his constitutional rights, no repetition of these rights is required." State v. Melvin, 65 N.J. 1, 14, 319 A.2d 450 (1974); State v. Magee, 52 N.J. 352, 374-75, 245 A.2d 339 (1968), cert. denied, 393 U.S. 1097, 89 S.Ct. 891, 21 L.Ed.2d 789 (1969). Defendant is a high school graduate *397 with a brief exposure to college. He was in good health and nothing suggests that his will was overborne. The trial court's finding that his confession was voluntarily given is unassailable.
Defendant next contends that the trial court erred in refusing to instruct the jury on passion/provocation manslaughter. Passion/provocation manslaughter is a homicide that would otherwise be murder when "committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4b(2); State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990). The standard for determining whether a homicide may be treated as manslaughter by reason of passion/provocation is whether the slaying was committed in a transport of passion or heat of blood induced by a reasonable provocation where the provocation is adequate, where defendant has not had sufficient time to cool off between the provocation and the slaying, where the provocation actually did impassion the defendant and where the defendant did not cool off before the slaying. State v. Mauricio, supra, 117 N.J. at 411, 568 A.2d 879; State v. Crisantos, 102 N.J. 265, 274, 508 A.2d 167 (1986). But a court may charge a jury on lesser-included offenses such as passion/provocation manslaughter only when there is a rational basis in the evidence for a verdict convicting the defendant of such an offense. N.J.S.A. 2C:1-8e; State v. Ramseur, 106 N.J. 123, 269-70, 524 A.2d 188 (1987).
To support his claim of passion/provocation, defendant relied upon the testimony of Dr. Chester L. Trent, a psychiatrist, who described defendant as suffering from a borderline personality disorder. In explanation, he stated that "[p]atients with borderline disorders can't really control themselves and suppress feelings of irritation and anger like a normal person can." He added that such personalities have "tremendous difficulty about enduring a separation experience, about being alone, about being cut off from a very important person. And so a fear of abandonment, either real or otherwise, is one of the major fears *398 and one of the major motivating forces for their behavior or actions." Defendant maintains that in light of his deficient behavior controls the threatened termination of his affair with Dawn constituted a reasonable provocation. But this is rebutted by the following explication on the subject of passion/provocation manslaughter in State v. Pratt, 226 N.J. Super. 307, 317, 544 A.2d 392 (App.Div. 1988):
The point to be stressed is that in drawing a line between murder and manslaughter, there was no purpose to subject others to harm at the hands of those easily provoked and subjectively prone to violence. On the contrary, the aim of the law was to protect the innocent from mortal attack by the psychologically sick or immature who are unable to exercise normal self-control as well as by those motivated by evil.
See also State v. Mauricio, supra, 117 N.J. at 410, 568 A.2d 879.
We conclude that there was no basis in the evidence for a belief that defendant killed Leonard Jones in response to a provocation sufficient "to inflame the passions of a reasonable person" so that defendant's loss of self-control could be said to be a "reasonable reaction." Mauricio, supra, at 412, 568 A.2d 879. The jury charge on passion/provocation manslaughter was therefore properly denied.
During the trial, defendant called Dawn Jones to the witness stand to testify on his behalf. Dawn had pled guilty to the charge of conspiring with defendant, but had not yet been sentenced at the time of trial. Thus, in response to each of more than 300 questions posed to her by defendant out of the jury's presence, she declined to answer on the ground of possible self-incrimination. Defendant now complains that because the court did not order Dawn to answer the questions he was, in effect, deprived of the right of compulsory process. We disagree.
Dawn's privilege to refuse disclosure of any matter that would incriminate her cannot be questioned. Evid.R. 25; State v. Nunez, 209 N.J. Super. 127, 131-32, 506 A.2d 1295 (App.Div. 1986). Defendant's questions concerned the details of their *399 relationship, any of which, if answered by the witness, would clearly have had a tendency to implicate her in the commission of the crime. Furthermore, the exclusion of Dawn's testimony was harmless under the circumstances. The thrust of defendant's questions was to elicit information concerning the intensity of their relationship and the extent of defendant's dependence upon Dawn's nurture as a foundation for Dr. Trent's opinion testimony explaining why defendant's behavior controls failed. It is evident to us that in finding defendant guilty of aggravated manslaughter, rather than murder, the jury fully credited the doctor's testimony without the necessity of further evidence. As we have already said, defendant's emotional frailties could not have served to mitigate further the degree of homicide, so that even if Dawn had been ordered to answer defendant's questions the court still could not have charged the jury as to passion/provocation manslaughter.
We find merit in defendant's contention that the evidence was insufficient to support the charge of conspiring with Dawn to murder Leonard. The only evidence offered to prove that defendant and Dawn had entered into such a conspiracy was the contents of his recorded statements to the police on the morning of November 28, 1987. In that statement he described his relationship with Dawn, his constant need for her, and conversations they had about killing Leonard. From the statements, it appears that they first discussed this about a month before the crime. As defendant said, "It was more, I guess, just a wish, we wished this would happen and we wished that would happen." Defendant put it the following way:
Well, I had said it would be nice, you know, if I could shoot him. She says well it would be nice if I could just put something in his drink and, you know, no one would ever know. But it was just, you know, a wish. We wished this would happen we wished that would happen.
Defendant stated that he had first talked about killing Leonard two or three times during the two weeks preceding the event, but that Dawn had rejected his specific proposals. Although the language of defendant's statements is sometimes *400 ambiguous, at no point in any of the conversations recounted by defendant did Dawn ever "agree," either expressly or by implication, to any plan specifically proposed. As to his proposal to shoot Leonard at Leonard's gas station and make it look like a robbery, defendant said "she didn't think it was a good idea," and objected on the ground that "it's too open, it's too open." At another point in his statement defendant described the idea he presented to Dawn that he shoot Leonard while Leonard was driving down Butler Road to his home, but "she couldn't see any reason for me, it was, it was just to [sic] weird. Why would somebody shoot him on the, you know, just driving down on the road."
Defendant had apparently conceived a plan to commit the killing at Leonard's gas station on Tuesday, November 24, four days before the scheduled high school reunion. As to this, he said the following:
Well, after I told her I was gonna try at the gas station, I told her and ahhh, said I'm gonna try at the gas station, I'm gonna try at the gas station and she goes, it's, it's, it's up to you. She goes, I don't want you to do it. So, I said okay and I hung up with her and I was trying to, to go through with it and I was getting stopped by fences and too many people are coming in and out so I decided not to do it. I went back home....
It is clear from the foregoing that defendant's plan was not carried out and he reported this to Dawn. Defendant then related Dawn's response in the following language:
She goes, I am glad that, that you didn't do it because I didn't want to see you get hurt and she goes, now that I know that you can't do it, now, now it's, now I definitely know that we're, that we're not going to be together and you just have to face that we aren't gonna be together so you should just try to forget, not forget, but just try to go on with your life without me. And I just said I couldn't cause you mean a ... a lot to me.
That was the last conversation the two had about shooting Leonard. As defendant stated during the videotaped re-enactment, "I just had to be with her and I did this on, on my own."
N.J.S.A. 2C:5-2 provides in pertinent part:
a. Definition of conspiracy. A person is guilty of a conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

*401 (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
(2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
As the Supreme Court explained in State v. Carbone, 10 N.J. 329, 91 A.2d 571 (1952):
At common law, a conspiracy consists not merely in the intention but in the agreement of two or more persons (not being husband and wife) to do an unlawful act, or to do a lawful act by unlawful means. So long as such a design rests in intention only, it is not indictable. When two agree to carry it into effect, the very plot is an act in itself, and the act of each of the parties, promise against promise, actus contra actum, capable of being enforced if lawful, punishable if for a criminal object or for the use of criminal means. The agreement is an advancement of the intention which each has conceived in his mind; the mind proceeds from a secret intention to the overt act of mutual consultation and agreement. * * * The offense depends on the unlawful agreement and not on the act which follows it; the latter is not evidence of the former. [Id. at 336-37, 91 A.2d 571 (citations omitted)].
The mere knowledge, acquiescence, or approval of the substantive offense, without an agreement to cooperate, is not enough to establish one as a participant in a conspiracy. 15A C.J.S. Conspiracy, § 39 at 733 (1967). There must be intentional participation in the activity with a goal of furthering the common purpose; mere association is inadequate. Id. at 733-34. See also, Torcia, Wharton's Criminal Law, § 726 at 535 (14th ed. 1981).
In our view, the evidence presented could not support a legitimate belief that "with the purpose of promoting or facilitating its commission," N.J.S.A. 2C:5-2a, Dawn agreed with defendant that defendant should shoot Leonard or agreed to aid defendant in planning or committing the crime. Whatever wishes she may have harbored concerning her husband's death and whatever discussions Dawn may have had with defendant on that subject, we conclude that they never rose to the level of an agreement between them.
Even if the contents of defendant's statement did spell out the unlawful agreement, the State's proof of this crime nevertheless fails for the additional reason that the admissions *402 as to the supposed conspiracy are not corroborated by independent evidence. In State v. Lucas, 30 N.J. 37, 56, 152 A.2d 50 (1959), the Supreme Court stated that where a confession is offered for the truth of its contents:
the State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury ...
More recently, the Court enlarged on this by stating:
[a]ll elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense "through" the statements of the accused.
State v. DiFrisco, 118 N.J. 253, 273, 571 A.2d 914 (1990) (quoting Smith v. United States, 348 U.S. 147, 156, 75 S.Ct. 194, 199, 99 L.Ed. 192, 200-01 (1954)). Therefore, "[a]s long as the confession is `corroborated by other evidence tending to strengthen it, ... the criminal agency (as well as defendant's connection with the crime) may be proven by the confession itself.'" State v. Mancine, 124 N.J. 232, 250-51, 590 A.2d 1107 (1991) (quoting State v. Lucas, supra, 30 N.J. at 54, 152 A.2d 50).
The evidence relied upon by the State as corroboration relates only to the substantive crime of manslaughter. As we said earlier, assuming that defendant's statements suggest a conspiracy between defendant and Dawn, the State points to nothing in the independent evidence which bolsters the confession or tends to generate a belief in its trustworthiness as to the crime of conspiracy.
Finally, defendant complains that the 30-year sentence with a 15-year period of parole ineligibility for aggravated manslaughter is manifestly excessive. He maintains that under the circumstances he should have been sentenced to no more than the presumptive term of 20 years. He contends that the court overlooked as mitigating factors the fact that there were substantial grounds tending to excuse his conduct, that he has no history of prior delinquency or criminal misconduct, that his conduct was the result of circumstances unlikely to recur and *403 that his character and attitude indicate that he is unlikely to commit another offense.
We conclude that under no view of the evidence could the court have found substantial grounds tending to excuse or justify defendant's conduct. Although the other factors advanced by defendant in mitigation of punishment might have been considered by the court in its discretion pursuant to N.J.S.A. 2C:44-1b(7), (8) and (9), it was not required to do so. Of greater concern to us is the fact that the court found as an aggravating factor the gravity and seriousness of the harm inflicted on Leonard Jones. Obviously, the harm to Jones is an essential element of the crime of manslaughter and, as the Supreme Court has said, "... the factors invoked by the Legislature to establish the degree of the crime should not be double counted when calculating the length of sentence." State v. Miller, 108 N.J. 112, 122, 527 A.2d 1362 (1987). See also, State v. Pavin, 202 N.J. Super. 255, 266-67, 494 A.2d 834 (App.Div. 1985); State v. Martelli, 201 N.J. Super. 378, 386, 493 A.2d 70 (App.Div. 1985).
In addition, as an aggravating factor the court stated that the victim of the offense "was particularly vulnerable or incapable of resisting due to advanced age, disability, ill health, or extreme youth, or was for any reason substantially incapable of exercising normal physical or mental power of resistance" within the meaning of N.J.S.A. 2C:44-1a(2). We are unable, however, to determine from these remarks what factors personal to the victim rendered him in some way "particularly vulnerable or incapable of resistance." The only other aggravating factor noted by the court was the need for deterrence, special and general.
Because the court double counted an element of the offense as an aggravating factor and because we are unable to discern a factual basis for the court's finding as an aggravating factor that Leonard Jones was particularly vulnerable, we conclude that a resentencing is necessary. We choose not to exercise *404 our power to modify the sentence under N.J.S.A. 2C:44-7, and elect instead to remand the matter to the sentencing judge who presided over the trial and who is presumably more sensitive to the nuances of the case than we.
The sentencing court is directed to reconsider fully the imposition of sentence without reference to the harm caused the victim as an aggravating factor. If the court on reconsideration again finds as an aggravating factor that the victim was particularly vulnerable or incapable of resistance it is directed to specify factually in what way his powers of resistance were impaired.
The conviction for conspiracy is reversed and the sentence imposed thereon is vacated. The conviction for aggravated manslaughter is affirmed. The matter is remanded to the Law Division for resentencing on the aggravated manslaughter conviction in accordance with this opinion.