STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. EDWARD A. KING, DEFENDANT-APPELLANT.

Argued December 18, 1961—Decided May 7, 1962.

*Mr. James Dorment, Jr.,* argued the cause for defendant-appellant.

*Mr. William A. O'Brien,* Assistant Prosecutor of Hudson County, argued the cause for plaintiff-respondent (*Mr. Lawrence A. Whipple,* Prosecutor of Hudson County, attorney).

The opinion of the court was delivered by

HANEMAN, J. The Grand Jury of Hudson County indicted defendant, charging that on November 11, 1960 he "did wilfully, feloniously and of his malice aforethought kill and murder Arlene McCrystal." The matter having been tried and the jury having found defendant guilty in the first degree with a recommendation of a sentence of life imprisonment, he appeals to this court as a matter of right from the judgment entered on the verdict. *R. R.* 1:2–1(c).

The facts developed at the trial concerning the fatal incident are mostly undisputed. The evidence established that defendant was married in 1945 and had three children. Some time in 1952 he left his wife and family and commenced living with another woman, by whom he had a child, without the sanction of marriage. In March 1960 defendant was employed as a bartender at the Musical Bar in Union City. This saloon was located within a city block of a tavern known as the Sawdust Trail Tavern, to which reference will be hereafter made. One of the regular customers at the Musical Bar at that time was Arlene McCrystal, known by the nickname of Mickey. She was

the mother of three children but was living apart from them and her husband. Defendant commenced keeping company with her shortly after their initial meeting in March 1960. They spent their time in nightly drinking at various taverns. In the latter part of April 1960 defendant and Mickey rented an apartment in West New York under the names of "Mr. and Mrs. King" and cohabited as husband and wife until the homicide which occurred on November 11, 1960. Their association was not always peaceful. They engaged in a number of arguments during which Mickey threatened to terminate their relationship. On one of these occasions, in September 1960, defendant became embroiled in a bar with several men who prevented him from hitting Mickey. He later that day confided to a friend that he was seeking a gun "to shoot her."

On November 11, 1960 defendant and Mickey left their apartment at about 10:30 in the forenoon. They took a bus to Union City and separated, agreeing to meet at some indefinite time at the C. C. Bar in Union City. Upon his arrival in Union City defendant went to the C. C. Bar where he commenced imbibing. He shortly left the C. C. Bar but continued to drink at a number of taverns, returning there periodically to "see if she [Mickey] was around." On one of these occasions he was handed a letter from Mickey by the bartender, in which she stated that it was "better we split up."

In the light of their previous arguments, defendant was not, apparently, impressed with the finality of Mickey's decision. He proceeded to the home of a mutual female friend seeking Mickey. Not finding her, he continued drinking in various taverns, finally arriving at the Sawdust Trail Tavern at about 10:00 P. M. He testified that he then "felt good," had "a woozy feeling" from "drinking all day" and "felt melancholy, blue." He had no recollection of having eaten the entire day.

During defendant's peregrinations Mickey commenced a similar tour at 2:00 P. M. in the company of a girl friend.

They embarked upon their trip at Otto's Bar, Hoboken, where they met two other girls. Three of the girls were drinking. The fourth, Barbara Lee Finn, 19 years of age, testified that she did not drink because she was bothered by an abscessed tooth. Having visited a number of taverns, the four finally arrived at the Sawdust Trail Tavern about 10:00 or 10:30 P. M. King was then sitting near the end of the bar not far from the ladies room. The girls selected stools at the bar in close proximity to defendant, Mickey sitting some three or four stools away from him. None of the witnesses, with the exception of Finn, could testify to the nature of the conversations between the accused and the victim. Finn, however, was quite specific as to the exact statements. She testified that Mickey "cursed" him, and quoted some foul and obscene appellations which Mickey uttered, connoting that defendant was a sexual pervert. On one occasion, stated Finn, Mickey arose from her stool and "pushed against" defendant on her way to the ladies room, continuing with her vituperative comments. After Mickey went to the lavatory, King said to Finn, "What's wrong with Mickey? What am I going to do with her— Mickey? I love her and she knows it." King said that "he couldn't take it any more, that she was embarrassing him; she had embarrassed him in almost every bar in Union City." King got up, left the tavern for ten to twenty minutes. Upon his return, he first went to the men's lavatory, then walked over to Mickey, who was seated at the bar, and asked her, "Are you coming with me?" He repeated this request two or three times. In answering, Mickey said "something like, 'I had better not be pregnant' —that she didn't want another bastard walking around." King replied, "You don't mean that, you don't mean that, Mickey, do you?" At this point Finn, noting that King had something in his overcoat pocket, and sensing danger, told Mickey to "Go into the ladies room. I'll talk to Eddie."

Mickey entered the women's lavatory with one of her friends, Patricia Dorn, who held on to the doorknob in order

to keep the door closed. Defendant, however, pulled open the door which Mickey was facing. In response to defendant's suggestion that she leave with him, Mickey refused. Defendant then pulled a revolver from his waistband and fired five shots at Mickey, who tried to hide in the four by eight foot ladies room. Finn rushed to the lavatory, pushing defendant's arm. He paused, swayed and fired a sixth shot. Defendant then walked out of the tavern with the gun held at chest level. Four of the six bullets entered Mickey's body. Mickey died the same night. The murder weapon and a box of cartridges were found the morning of November 12 in the rear of the Musical Bar. Although tested, no legible fingerprints were discernible.

King testified that he did not have a revolver in his possession on his first visit to the Sawdust Trail Tavern; had never seen the murder weapon before it was shown to him at the trial; had never before used a gun; vaguely remembered leaving the Sawdust Trail Tavern at about 10:15 P. M., and had no recollection of returning to the tavern or of having shot Mickey. He described the incidents which occurred at the Sawdust Trail Tavern from the time of his first arrival to his first departure with clarity and in considerable detail, including conversations had before the advent of Mickey at the bar. He professed not to remember the exact "curse" words used by her at that time. His first recollection, after his initial departure from the saloon, he testified, was that he found himself at 1:00 or 1:30 A. M. walking the streets in Hoboken. In answer to a telephone call which he then made to the C. C. Bar requesting that someone with a car pick him up, he was advised that Mickey had been shot or that he had shot her. Thereupon he took a bus to New York City and walked the streets for several hours. Finally, he took a bus to Newark and telephoned his mother at Lake Parsippany, requesting that she meet him at Morristown. He proceeded by bus to Morristown, where he met his mother in a public restaurant. They agreed during the conference there that

he should surrender himself to the police. The mother having telephoned an attorney at 1:00 P. M. on November 12 requesting that he make the necessary arrangements, King, accompanied by his attorney, surrendered himself to the police at 9:00 A. M. November 13.

Defendant advanced five grounds for the reversal of his conviction:

(1) The trial court failed to instruct the jury that decedent's behavior toward defendant prior to the homicide, superimposed upon the accused's alcoholic condition, might be found to have affected his mental powers to such an extent that he did not in fact premeditate or deliberate, thus serving to hold the offense to second degree murder.

(2) The trial court charged the jury that insulting language or conduct alone could not constitute sufficient provocation to reduce a homicide from murder to manslaughter and thereby, in effect, instructed the jury that the evidence could not support a verdict of manslaughter.

(3) The trial court included an instruction on flight which was unwarranted by the evidence, and improper.

(4) The State cross-examined the witness Finn in an improper and prejudicial manner.

(5) The trial court refused to compel the State to product a written statement of the witness Finn for defense counsel's inspection at the trial.

We shall proceed to consider defendant's arguments in the order above set forth.

I.

At the outset we conceive it appropriate to discuss the employment of the word "mitigate" when describing the effect, upon the degree of murder, of the "prostration" of the mental faculties of a defendant who is being tried for the commission of a premeditated, deliberate and willful homicide.

In this discussion the terms "proof," "burden of proof," "burden of persuasion," and "burden of producing evi-

dence" will be used in the sense attributed to them by The Evidence Act, 1960. (*N. J. S.* 2A:84A-1 *et seq.*)

"2A:84A-4. 'Proof'

Rule 1. (3) 'Proof' is all of the evidence before the trier of the fact relevant to a fact in issue which tends to prove the existence or nonexistence of such fact."

"2A:84A-5. 'Burden of proof'

Rule 1. (4) 'Burden of proof' means the obligation of a party to meet the requirements of a rule of law that the fact be proved either by a preponderance of the evidence or by clear and convincing evidence or beyond a reasonable doubt, as the case may be. Burden of proof is synonymous with 'burden of persuasion.' "

"2A:84A-6. 'Burden of producing evidence'

Rule 1. (5) 'Burden of producing evidence' means the obligation of a party to introduce evidence when necessary to avoid the risk of a judgment or peremptory finding against him on a material issue of fact."

Additionally, it is well to remember that "mitigate," as defined in *Webster's New International Dictionary* (*2d ed.* 1943) means:

"1. To render or become mild or milder; to mollify. [now rare].

2. To moderate; to make or become less severe, violent, fierce, cruel, intense, harsh, rigorous, painful, etc.; to soften; appease; meliorate; diminish; lessen; temper; as, to mitigate heat or cold, grief, a punishment or an offense."

■ Where a defendant is charged with having committed a premeditated, deliberate and willful homicide, and the fact of an unlawful killing has been demonstrated, the crime is presumed to be murder in the second degree. *State v. DiPaolo*, 34 *N. J.* 279, 294 (1961), *certiorari* denied 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed. 2d* 80 (1961); *State v. Williams*, 29 *N. J.* 27 (1959); *State v. Wynn*, 21 *N. J.* 264 (1956). The State bears the burden of persuasion as to the existence of premeditation, deliberation and willfulness if it is to elevate the offense to murder in the first degree and it assumes the risk of the non-

persuasion thereof. *State v. DiPaolo, supra; State v. Williams, supra.* This burden and risk continue throughout the entire trial and never shift. See *Carroll v. Prudential Insurance Co.,* 125 *N. J. L.* 397 (*E. & A.* 1940) ; *Cella v. Roth,* 113 *N. J. L.* 458 (*E. & A.* 1934) ; *Hughes v. Atlantic City & S. R. R. Co.,* 85 *N. J. L.* 212, *L. R. A.* 1916A, 927 (*E. & A.* 1914) ; 9 *Wigmore, Evidence,* § 2489 (*3d ed.* 1940).

If the State has, at the close of its case, adduced sufficient proof of premeditation, deliberation and willfulness to establish a *prima facie* case of murder in the first degree, defendant may then produce testimony to weaken the impact of the State's proof in order to avoid the risk of a verdict of murder in the first degree. This is not to say that the burden of persuasion shifts but rather that the defendant is accorded an opportunity, if he so desires, to present testimony to meet or dilute the effect of the proof adduced by the State to the end the jury may conclude, upon a weighing of all of the facts at the close of the case, that the State has not carried its ultimate burden of proof beyond a reasonable doubt.

This difference is more than an exercise in semantics. Given the premise that all murder of the type here alleged is presumed to be of the second degree and that the State bears the burden of proof of raising the crime to murder of the first degree, it must be concluded that evidence of the impairment of an accused's mental faculties sufficient to negate the presence of one or more of the elements of first degree murder does not mitigate the crime from the higher degree to the lower. Rather, such evidence serves *to bar or prevent elevation of the crime* to the higher degree, because its effect is to so dilute the proof of the State that the presence of the essential elements of first degree murder cannot be said to have been demonstrated beyond a reasonable doubt. See, *e. g., State v. DiPaolo, supra; State v. Ernst,* 32 *N. J.* 567 (1960), *certiorari* denied 364 *U. S.* 943, 81 *S. Ct.* 464, 5 *L. Ed.* 2d 374 (1961) ; *State v. Smith,*

27 *N. J.* 433 (1958), *certiorari* denied 361 *U. S.* 861, 80 *S. Ct.* 120, 4 *L. Ed.* 2d 103 (1959); *State v. Tansimore,* 3 *N. J.* 516 (1950). A charge phrased to convey the impression that murder may be mitigated from first to second degree could well confuse a jury which is simultaneously charged that an unlawful homicide, as here, is presumed to be murder in the second degree. The implication inherent in such a charge is that the burden shifts to the defendant to negate the presence of premeditation, deliberation and willfulness, such elements having been once *prima facie* established by the State. This, of course, is erroneous, as the burden is that of the State to prove the existence of those ingredients beyond a reasonable doubt upon a consideration of all of the evidence at the close of the entire case. For clarity, therefore, although defendant's grounds of appeal have been couched in the heretofore more or less classical language, we shall discuss the question as one concerning the elevation, rather than the mitigation, of the degree of murder.

Defendant does not dispute the sufficiency of the court's charge insofar as it treated of the possible effect of his alleged voluntary intoxication upon the elevation of the homicide from second to first degree murder. He does argue that under the charge the voluntary intoxication of defendant was the sole thesis advanced for retention of the homicide at second degree and that this charge, by implication, thereby excluded from the jury's consideration the added effect of the alleged provocative conduct of the deceased upon the mental faculties of defendant and hence upon the degree of murder.

Defendant further contends that since the court discussed the effect of Mickey's alleged provocative conduct only upon the narrow issue of the reduction of the crime from murder to manslaughter, the charge impliedly eliminated from the jury's consideration the question of whether such conduct, superimposed upon defendant's intoxicated condition, could have affected his mental faculties to the

extent that he did not in fact premeditate or deliberate. He rationalizes that the jury should have been affirmatively instructed to consider whether this complex of intoxication and the conduct of the deceased did so affect his mind that, upon the totality of the proof, it could not be said there existed beyond a reasonable doubt the premeditation, deliberation and willfulness essential to first degree murder. The court's commission and omission in these respects, defendant argues, constitute reversible error.

Although admitting that no request to so charge and no objection to the failure to so instruct was made, defendant asserts that it was the duty of the court to charge the thesis now advocated *sua sponte,* in connection with the degree of murder, if any, of which defendant was guilty.

As authority for the principles embraced in that assertion there are cited *State v. DiPaolo, supra; State v. Wolak,* 26 *N. J.* 464 (1958), *certiorari* denied 365 *U. S.* 822, 81 *S. Ct.* 710, 5 *L. Ed. 2d* 701 (1961); *Wilson v. State,* 60 *N. J. L.* 171 (*E. & A.* 1897); *Warner v. State,* 56 *N. J. L.* 686 (*E. & A.* 1894).

As stated in *State v. Wolak, supra,* there may arise circumstances, other than the solitary fact of the intoxication of a defendant, which could serve to prevent the elevation of the homicide from second to first degree murder.

In *Wilson v. State, supra,* at *p.* 184, the court said:

"Intoxication is a *mere circumstance* to be considered in determining whether premeditation was present or absent." (Emphasis supplied)

More recently we said in *State v. DiPaolo, supra,* at *p.* 295:

"The capacity of an individual to premeditate, to deliberate, or to will to execute a homicidal design, or any deficiency in that capacity, may bear upon the question whether he *in fact* did so act. Hence evidence of any defect, deficiency, trait, condition, or illness which rationally bears upon the question whether those mental operations did *in fact* occur must be accepted."

In discussing the existence of the element of intent to kill, the court opined in *Warner v. State, supra,* at *p.* 688:

"A reasonable doubt of the existence of that fact might spring out of the drunkenness of defendant, or out of *any other cirumstances, or combination of drunkenness with other circumstances.*" (Emphasis supplied)

It is thus apparent that the judicial philosophy in this State has never been blind to the fact that drunkenness, alone or in combination with other factors, may have a very real impact on the question of whether the State has proven beyond a reasonable doubt the elements of premeditation, deliberation and willfulness. And this approach commends itself to reason, for the distinction between murder in the first and second degrees rests in, and is inextricably bound up with, the state of mind of the accused.

█ While recognition of the validity of the above principle presents no particular problem the fashioning of a practical norm or formula within the general framework of the reasonable doubt criterion against which must be measured the totality of proof in every criminal case, is not so easy of accomplishment. Heretofore the rule has most often found expression in terms of whether the degree of intoxication or other mental impairment alleged as a bar to a first degree conviction robbed the accused of the *capacity* to premeditate or deliberate. Phrased in such terms the rule may mislead since the ultimate inquiry at trial is whether the State has proven beyond a reasonable doubt that the accused did, *in fact,* premeditate, deliberate and willfully kill. See *Wilson v. State, supra,* at *p.* 186 (dissenting opinion). It follows then that the test of whether drunkenness or any other cause, or any combination of causes, bars elevation of the homicide to the first degree is whether such influences so acted upon the defendant's mind that, upon the totality of the proof, it cannot be said there existed beyond a reasonable doubt the premeditation, deliberation and willfulness essential to first degree murder.

Capacity, as stated in *DiPaolo, supra,* has meaning within such a context only as a logical step in the determination of whether the impairment of the mental faculties did, *in fact,* prevent premeditation, deliberation or willfulness.

Thus, in the abstract, defendant propounds a correct thesis when he argues that the combination of his intoxication and the conduct of Mickey could together have prevented elevation of the crime to the first degree, if he in fact failed to premeditate or deliberate as a result of the concerted impact of the above conditions.

But examination of the instructions to the jury in this case discloses that the trial judge properly charged that murder, committed as here alleged, was presumed to be murder of the second degree and that "to raise it to the crime of murder in the first degree" the State must prove the "elements of deliberation and premeditation * * * [and] wilfulness" beyond a reasonable doubt. The final factual determination was left to the jury on the entire record of the case. The jury was instructed that although voluntary intoxication was no defense to murder it should be considered on the question of degree. The charge on the effect of intoxication upon the degree of murder was in the identical language of defendant's request. The jury was not directed to ignore the possible effect of the conduct of the deceased upon defendant's capacity to premeditate and deliberate. In fact, the gist of the entire charge was that intoxication was only one of the circumstances of the case to be considered by the jury in connection with all of the other circumstances in determining whether the State had met its burden in the proof of the three essential elements necessary to elevate the crime to first degree murder.

We conclude the jury was adequately charged that the State must prove the elements of premeditation, deliberation and willfulness beyond a reasonable doubt before a verdict of murder in the first degree could be returned. The charge was sufficient to instruct the jury that if for any reason any

one of these elements was not so proved the homicide was a second degree murder. They were not precluded, by implication, from considering that the absence of any one of those elements might have been occasioned by a combination of circumstances acting upon the mind of defendant. Neither did the charge relating to manslaughter, when taken in context, serve to eliminate from the consideration of the jury the question of whether the conduct of the deceased, superimposed upon defendant's intoxicated condition, so affected defendant that he did not in fact premeditate or deliberate.

· We find that the defendant was not prejudiced by the charge.

## II.

The court charged on manslaughter:

"However, the court charges you as a matter of law words alone, however insulting, will not reduce a homicide to manslaughter. Insulting or threatening language, looks or gestures, cannot constitute adequate provocation sufficient to reduce a murder to manslaughter.

The court further charges you as a matter of law that where the provocation consists only of words, and a weapon is used which will probably produce death, words are not an adequate provocation to reduce the offense of murder to manslaughter."

Defendant, admitting that this charge is in the approved language of the common law and accepted and recognized as the law of this State, seeks to have this court expunge so much thereof as would result in making the proof of insulting and contemptuous behavior alone, unaccompanied by a physical contact, a sufficient ground to reduce the crime from murder to manslaughter.

As late as the sixteenth century, murder in England was understood to mean a homicide accomplished in furtherance of "a deliberate, premeditated intent to kill formed some time beforehand and that no killing 'on a sudden' even without provocation or on slight provocation was con-

sidered murder." *Royal Commission on Capital Punishment Report,* 1949–1953, *pp.* 27–28 (1953). At that time distinction between murder and manslaughter rested upon the simple distinction between a killing upon waylaying and premeditation, and a sudden falling out. Gradually, commencing with the seventeenth century, the law superseded this oversimplified view and recognized that a homicide must be judged principally by the extent to which the circumstances of a case show "on the one hand, brutal ferocity, whether called into action suddenly or otherwise, or on the other, inability to control natural anger excited by a serious cause." 3 *Stephen, History of the Criminal Law of England,* 71 (1883). Thus the law, while retreating from its sixteenth century absolution of the killer "on a sudden," recognized the frailties of man and ameliorated the punishment for a homicide by the nature of its moral character. Over the years the test of "serious cause," in England came to be referred to as provocation. The reduction of the homicide from murder to manslaughter by provocation is a two-stage proceeding in England, (1) the provocation must be so gross as to cause the ordinary reasonable man to lose his self control and to use violence with fatal results, and (2) the defendant must in fact have been deprived of his self control under the stress of such provocation and must have committed the crime while so deprived. *Holmes v. D. of P. P.* [1946] *A. C.* 588; *Mancini v. D. of P. P.* [1942] *A. C.* 1. Coincident with the development of the law in England, the law was similarly developed in this State, although our cases have not expressed this principle in identical fashion. However, we have on a case by case basis established that to reduce the crime from murder to manslaughter it must appear that the killing occurred during the heat of a passion resulting from a reasonable provocation, a passion which effectively deprived the killer of the mastery of his understanding, a passion which was acted upon before a time sufficient to permit reason to resume its sway had passed. See, *e. g.,*

*State v. Zellers,* 7 *N. J. L.* 220 (*Sup. Ct.* 1824); *Brown v. State,* 62 *N. J. L.* 666 (*E. & A.* 1899); *State v. Agnesi,* 92 *N. J. L.* 53 (*Sup. Ct.* 1918), affirmed 92 *N. J. L.* 638 (*E. & A.* 1919); *State v. Wynn,* 21 *N. J.* 264 (1956); *State v. DiPaolo, supra.* In England, mere words, however insulting or reproachful, do not constitute provocation. *Perkins, Criminal Law* 49 (1957). The inadequacy of insulting words alone as productive of a passion sufficient to reduce the crime to manslaughter has also been upheld in this State. See *Warner v. State, supra,* 691; *Clifford v. State,* 60 *N. J. L.* 287 (*Sup. Ct.* 1897), affirmed 61 *N. J. L.* 217 (*E. & A.* 1897). See also *Wharton, Criminal Law and Procedure* 589, § 277 (1957). In effect, the principles just enunciated represent the "reasonable man" test of the English law, albeit in less precise fashion. The conclusion to be gleaned from a reading of our cases is that the English formalized test is a proper statement of our view of the law.

We perceive no reason under the facts here present, including the nature of the alleged insulting remarks, the setting in which they were uttered, and the time lapse between the utterance thereof and the commission of the homicide, to consider whether the law as it now exists should be broadened.

 Additionally, defendant argues that in any event, if this court determines to adhere to the law as it now exists, the trial court committed error in its charge by failing to instruct the jury as to the effect of the testimony that Mickey "pushed" into defendant on one occasion. It must be remembered that this incident occurred before defendant first left the tavern and some 15 to 20 minutes before the shooting. Also, the "pushing" incident, when considered in context with the balance of the testimony and as impliedly admitted by Finn, was no more than a bump. This act of the deceased was insufficient to constitute a physical provocation, a "sudden provocation, and a provocation sufficient to arouse the passions of an ordinary man beyond the

power of his control." Nor was it "immediately followed by a counter blow which proved fatal." *State v. Herrmann,* 77 *N. J. L.* 534, 535, 536 (*E. & A.* 1909). See also *State v. Wynn, supra.*

We find no error under defendant's second argument.

### III.

The facts warranted the general charge on flight. The charge was so limited as to advise the jury that if defendant were under the influence of liquor to the extent claimed in his defense there could arise no inference of consciousness of guilt because of the fact of flight, for if his intoxication prevented his remembering the events which happened, he could not then have been conscious of guilt. The charge was in this respect entirely proper.

### IV.

No objection was taken to the cross-examination of Finn. The cross-examination concerned matters directly in issue and reasonably within the scope of the direct examination and was, therefore, proper.

### V.

To understand defendant's final argument, some further recital of the factual setting is required. Although Finn had given a statement to the police shortly after the shooting, had been subpoenaed by the State, and was present in the courtroom during the trial, she was not called as a witness by the State. After the State had rested, she volunteered her services as a witness to defense counsel. He placed her on the stand without having first interviewed her. During her examination she testified that she could not clearly remember the facts that her written statement encompassed and requested leave to examine it to refresh

her recollection. This she was permitted to do. Although the trial judge at that time denied defense counsel's request for the statement for his use in conducting his examination of the witness, court was immediately adjourned after the witness had studied the statement and defense counsel was accorded the opportunity to confer with Finn. This he proceeded to do. On the succeeding day he continued with his examination of her. The trial judge himself read the statement and allowed liberal questioning by defendant.

In *State v. Johnson*, 28 *N. J.* 133, 142 (1958), we held that a defendant was not entitled, as a matter of right, to a pretrial inspection of the statements of prospective state witnesses. This was based upon *R. R.* 3:5–11, which reads:

"Upon motion of a defendant made at any time after the filing of the indictment or accusation, the court shall order the prosecutor to permit the defendant to inspect and copy or photograph designated books, tangible objects, papers or documents other than written statements or confessions made by the defendant obtained from or belonging to the defendant and may, if the interests of justice so require, order the prosecutor to permit the defendant to inspect and copy or photograph written statements or confessions made by the defendant and designated books, tangible objects, papers or documents obtained from others except written statements or confessions."

We have also held that a defendant may at the time of trial call for production of prior statements of witnesses who have testified against him for use in cross-examination. *State v. Hunt*, 25 *N. J.* 514 (1958). Defendant's request here does not fall within the cited Rule or *Hunt*.

The issue here projected is one which calls for the exercise of judicial discretion by the trial court. If the statement contained information not testified to by the witness which might have aided the defendant's cause the court could have permitted defendant's counsel to examine it. This, of course, contemplates an examination of the statement by the judge upon defendant's request for leave to examine. We sent for and have examined the statement of Finn. We conclude that her testimony covered practically the entire material subject matter of her statement. Under the cir-

cumstances here present the trial court did not abuse its discretion and the defendant suffered no prejudice.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For reversal*—None.