NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5304-12T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FERNANDO CARRERO, JR.,
a/k/a FIPO,

    Defendant-Appellant.

_____

Argued December 15, 2015 – Decided June 10, 2016

Before Judges Yannotti, St. John and Guadagno (Judge Guadagno dissenting).

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 08-10-1706.

Marcia Blum, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ms. Blum, of counsel and on the brief).

Catherine A. Foddai, Senior Assistant Prosecutor, argued the cause for respondent (John L. Molinelli, Bergen County Prosecutor, attorney; Ms. Foddai, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Fernando Carrero appeals from his conviction after a jury trial for, among other counts, first-degree murder. Defendant challenges his conviction on numerous grounds, including: (1) the denial of his request for a passion/provocation jury charge; (2) the admission of other-bad-acts evidence under N.J.R.E. 404(b); (3) the admission of double-hearsay testimony regarding an alleged conversation between the victim and defendant more than a week before the shooting; (4) the admission of defendant's physical and spoken responses to police inquiries regarding whether any weapons were present at the site of his arrest; and (5) the life sentence with a sixty-three-year parole disqualifier.

I.

The record discloses the following facts and procedural history. On December 6, 2007, upon motion by the State, the Chancery Division agreed that defendant, a juvenile, would be tried as an adult, and waived jurisdiction in favor of the Law Division. Subsequently, in late 2008, defendant was charged with the first-degree murder of Jose Hall, N.J.S.A. 2C:11-3(a)(1), (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree possession of a handgun without the requisite permit, N.J.S.A. 2C:39-5(b); and third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1).

Between 2009 and 2012, pretrial hearings were conducted,

resulting in the admission of (1) the revolver used to murder Hall, (2) <u>N.J.R.E.</u> 404(b) evidence regarding defendant's abusive and controlling behavior toward his girlfriend, (3) defendant's statements to police, (4) defendant's letters written to his sister while in custody, and (5) a statement by Hall. A jury trial ensued during January and February 2013, and defendant testified to his version of the events.

The trial record discloses the following testimony. K. Lowenstein dated C. Hicks for several years, and thereafter dated defendant. Hicks had a close friend named Jose Hall and, through Hicks, Lowenstein met Hall, with whom she became good friends. In 2003, after Lowenstein and Hicks broke up, Hicks moved into the basement of the three-story house that Lowenstein shared with her parents. Though Lowenstein was originally in favor of Hicks moving in, hoping that their romantic relationship would resume, that relationship did not ensue and they frequently came into conflict. Her relationship with Hall, however, did not change. He was a frequent visitor to the Lowenstein home, and was often included in family celebrations.

Lowenstein met defendant in 2005, and began dating him in May 2006. At first, the two were happy together, however defendant became more and more controlling. He forbade her from using her phone unless on speaker, seeing her friends, looking at other males, or doing anything that he did not say she could

do. Five or six months into their relationship, defendant struck Lowenstein.

In mid-July 2007, after a date, Lowenstein dropped defendant off at his parents' home in Newark. The next day, while driving in Newark with Lowenstein, defendant told her that he thought he "saw a car full of guys wearing red bandanas waiting outside his house to kill him." Defendant believed that both Hicks and Hall were in the car and that Lowenstein had set him up. Lowenstein informed defendant that Hall and Hicks were in Delaware working at a carnival, noting that the car the two had used the night before belonged to Hall. Defendant subsequently drove to a side street, parked, and told Lowenstein that he was going to ask her if she "set him up."

Because, as Lowenstein testified, "he knew the answer was yes," defendant told her that every time Lowenstein "lied," he would punch her. Defendant punched her "about 11 or 12 times" on the left side of her temple until a bloodied Lowenstein finally answered, "yes it was them."

In late October 2007, defendant and Lowenstein drove to her house to pick up a movie. Hall was at the house that day. While Lowenstein went inside, Hall went outside to attempt to initiate conversation with defendant. Accounts differ as to the conversation. Lowenstein (who did not witness the conversation) testified that defendant remained in the car because her mother

"didn't want him and [Hicks] getting into any arguments." Hall told her that he offered defendant a sort of "peace treaty," telling him that as both he and Hicks had girlfriends, and since defendant and Lowenstein loved one another, defendant had "nothing to worry about." Hall told Lowenstein that the two shook hands and agreed that "everything was going to be okay."

Defendant offered a different account. He agreed that Hall approached him while he was sitting in the car, but denied the two had a rapprochement. Instead, he claimed Hall simply told him to "step out of the car, I want to talk." Defendant replied that he did not trust Hall, and rolled up the window. Hall persisted until, moments later, Lowenstein came out of the house to the car. Hall then smiled at defendant, turned around, and left.

Lowenstein recalled that during her relationship with defendant, she usually stayed at his parents' home overnight. During the week leading up to the shooting, however, defendant had been staying with Lowenstein at her parents' home. Lowenstein nevertheless had hoped that the situation would soon resolve itself, as Hicks, who planned on joining the Army, would soon be leaving for basic training. Then Hall would not come as frequently to her home.

On the night of the incident, November 6, 2007, Lowenstein returned home at about 4:30 p.m. Defendant was already there.

Between 6:00 and 6:30 p.m., defendant drove Lowenstein to her job in the Willowbrook Mall.  Around 11:00 p.m., defendant picked Lowenstein up from the mall; at 11:15, they dropped off her co-worker and drove to Lyndhurst.  During the trip, Lowenstein's mother called to say that, because Hicks and Hall were at the house, she did not want defendant to stay over.  Defendant called his sister to ask if he could spend the night with her.  When he could not reach his sister, Lowenstein told him to continue to her house and try again later.  They arrived at the Lowenstein home shortly before midnight, and sat down together in the living room.

Hall, Hicks, and Hicks' girlfriend were in the basement watching a movie.  A few minutes after defendant and Lowenstein entered the house, Hicks walked upstairs to get a drink from the kitchen refrigerator.  According to Lowenstein, Hicks pointedly stared at her and defendant before entering the kitchen.  When he returned to the basement, he informed Hall that defendant and Lowenstein were upstairs.  Hall did not react, and the three continued watching the movie.

At some point, defendant and Lowenstein moved to the kitchen to prepare food.  Lowenstein testified that they were "kissing and hugging," and she had her hands around his waist.  Several minutes later, Hall walked upstairs to the kitchen to look for food in the refrigerator.  Hall asked Lowenstein why

she had not told him that she started working at Victoria's Secret. Hall's girlfriend was employed at Victoria's Secret, and had previously informed Lowenstein of a job opening at the store. Lowenstein responded sarcastically, in an attempt to cut their conversation short. She testified, "[she] knew that if [she] got in a conversation with him, [defendant] would get upset." She also testified that "[Hall] is a ball buster. . . . I think he came upstairs to . . . test the waters and see how [defendant] felt . . . ."

In an effort to separate Hall and defendant, Lowenstein asked defendant to go upstairs with her. Meanwhile, Hall persisted in his questioning. Defendant ordered Hall to stop speaking to Lowenstein. Hall said he was just asking her a question, but defendant stood up from the table and insisted that Hall was not allowed to speak with her.

Lowenstein, afraid of a fight between them, left the kitchen to find her parents. As she walked toward the stairs, she heard Hall yell, "whoa, whoa, whoa," and then the sound of a gunshot. She ran back to the kitchen to find Hall on his back on the floor, with defendant pointing a gun at him. Lowenstein attempted to convince defendant to leave and tried to pull defendant's arm away, but defendant fought off her grip. He then shot Hall in the head. Lowenstein ran to get her parents.

Defendant gave a different account at trial. He admitted

that he had hit Lowenstein in the past, but said he had not done so since they broke up and got back together during the summer of 2007. Defendant testified that when Lowenstein initially left the kitchen to find her parents on the night of the incident, Hall said, "this is the last time you're going to come in this house. And stop talking to [Lowenstein]," then pulled a gun from his waistband. Defendant said he grabbed Hall's hand and pointed the gun toward Hall, and the gun fired during the struggle. According to defendant, Hall fell to his knees, but continued to struggle. He testified that Lowenstein then reentered the room, screaming, and jumped on his back. During the subsequent three-way struggle, the gun again fired, causing the wound to Hall's head. On cross-examination, defendant said he was afraid of Hicks and Hall for starting trouble whenever they were around.

During the incident, Hicks was in the basement and heard yelling and "thumping" noises, then Lowenstein's scream. Hicks went to the kitchen and found Hall on the floor bleeding, and saw defendant run out the back door, gun in hand.

Police responded and found Hall still alive. EMTs arrived but were unable to stop the bleeding. Hall was transported to the hospital, where doctors determined the initial gun-shot wound to his bladder was non-fatal if treated, but the gun-shot wound to his head was fatal, and therefore surgery was not a

8                                                          A-5304-12T3

realistic option.  Hall died several days later and an autopsy was performed.

The Newark Police Fugitive Apprehension Team found defendant at a house in Orange.  An officer asked him if there were weapons in the house.  Defendant motioned with his head toward a black duffel bag to the right of the couch he was sitting on, and the officers discovered a revolver inside the bag but left it there after securing defendant and the area.  The officers received written consent to search the area from the person renting the apartment, and secured the revolver and four rounds of ammunition.  When asked by the officers "if anything else in the bag was his," defendant responded, "nothing but the gun," and a cell phone on the couch.  Ballistics confirmed the revolver was the weapon used to kill Hall.  Defendant had no permit for the gun.

The jury convicted defendant of all counts.  After appropriate mergers, the sentencing judge sentenced defendant to life imprisonment, subject to an eighty-five-percent parole disqualifier on the first-degree murder charge.  Lesser concurrent sentences were imposed on the other counts.  This appeal ensued.

On appeal, defendant presents the following issues for our consideration:

## POINT I

BECAUSE THE COURT REFUSED TO ALLOW FOR INCONSISTENT THEORIES AND TO CONSIDER EVIDENCE OTHER THAN THAT ADDUCED IN THE DEFENSE CASE, IT IMPROPERLY DENIED AN INSTRUCTION ON PASSION/PROVOCATION MANSLAUGHTER.

## POINT II

THE COURT ERRED IN ADMITTING EVIDENCE, ON THE GROUND THAT IT WAS AN EXCEPTION TO N.J.R.E. 404(b), THAT CARRERO FREQUENTLY BEAT UP HIS GIRLFRIEND, WHICH HAD NO BEARING ON ANY MATTER AT ISSUE AND SERVED NO PURPOSE OTHER THAN TO INVITE THE JURY TO INFER THAT HE HAS AN AGGRESSIVE DISPOSITION SO AS TO UNDERMINE HIS CLAIM THAT HE ACTED IN SELF-DEFENSE.

## POINT III

THE DOUBLE-HEARSAY TESTIMONY ABOUT WHAT THE VICTIM TOLD A WITNESS ABOUT HIS CONVERSATION WITH CARRERO CONSTITUTED UNRELIABLE DOUBLE HEARSAY AND DID NOT MEET ANY EXCEPTION TO THE RULE EXCLUDING HEARSAY.

## POINT IV

CARRERO'S STATEMENT ABOUT OWNERSHIP OF THE GUN, AND THE GUN ITSELF, SHOULD HAVE BEEN EXCLUDED BECAUSE THEY WERE OBTAINED IN VIOLATION OF HIS RIGHT TO REMAIN SILENT.

## POINT V

SENTENCING A JUVENILE UNDER THE AGE OF 18 TO A LIFE TERM, WITH A MINIMUM PAROLE DISQUALIFIER OF 63 YEARS AND NINE MONTHS, CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT, PARTICULARLY BECAUSE IT WAS IMPOSED WITHOUT ANY CONSIDERATION OF HIS YOUTH. (Not Raised Below).

A-5304-12T3

Additionally, defendant has filed a pro se brief, in which he argues:

POINT I

DEFENDANT WAS DEPRIVED OF A FAIR TRIAL DUE TO PROSECUTOR'S INAPPROPRIATE AND LEGALLY INCORRECT STATEMENT MADE DURING CLOSING ARGUMENTS WHICH ATTRIBUTED TO PROSECUTORS MISCONDUCT, AS SUCH MISTRIAL SHOULD HAVE BEEN GRANTED. (Partially Raised Below).

POINT II

THE TRIAL COURT DENIED DEFENDANT HIS CONSTITUTION [SIC] RIGHT TO CONFRONT THE WITNESS AGAINST HIM IN VIOLATION OF THE VI AMENDMENT RIGHT OF THE UNITED STATES CONSTITUTION AND IMPEDED DEFENDANT FROM REVEALING AN AFFIRMATIVE DEFENSE FOR PASSION PROVOCATION.

POINT III

DEFENDANT'S CONVICTION IS ILLEGAL DUE TO THE WAIVER HEARING AT FAMILY COURT NOT PERFORMED IN ACCORDANCE WITH LAW AND DEFENSE ATTORNEY'S INEFFECIVE ASSISTANCE IN REPRESENTING THE YOUTHFUL DEFENDANT AT SAID HEARING WHICH MUST BE CORRECTED. (Not Raised Below).

POINT IV

DEFENDANT INCORPORATES BY REFERENCE ALL ISSUES RAISED ON DIRECT APPEAL BY BOTH DEFENDANT AND COUNSEL AND ASSERTS THAT THE CUMULATIVE ERRORS DENIED DEFENDANT A FAIR TRIAL.

II.

As noted, defendant argues that the judge erred by refusing to instruct the jury on passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2).

11                                          A-5304-12T3

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Daniels, 224 N.J. 168, 180 (2016). Where, as here, defense counsel requests a lesser-included offense instruction, the standard of review regarding the denial of that request requires a plenary consideration of whether "the evidence presents a rational basis on which the jury could acquit the defendant of the greater charge and convict the defendant of the lesser." State v. Brent, 137 N.J. 107, 117 (1994). The question is not whether the jury is likely to accept the defendant's theory, but whether it would have a rational basis on which to do so. State v. Mejia, 141 N.J. 475, 489 (1995). The failure to instruct the jury on a lesser-included offense that a defendant has requested, and for which the evidence provides a rational basis, warrants reversal of a defendant's conviction. Brent, supra, 137 N.J. at 118.

Our Supreme Court has held, "[a] defendant is entitled to an instruction on a lesser offense supported by the evidence regardless of whether that charge is consistent with the theory of the defendant's defense." Ibid. (citations omitted). So long as the evidence supporting a lesser-included offense "leaves room for dispute," the charge is appropriate. State v. Crisantos, 102 N.J. 265, 278 (1986) (quoting State v. Sinclair, 49 N.J. 525, 542 (1967)). Conversely, if there is not a rational basis to support the charge, it should not be given

because it "invites a jury verdict based on sheer speculation or compromise." State v. Bishop, 225 N.J. Super. 596, 602 (App. Div. 1988).

In State v. Castagna, we noted, "[t]his 'rational basis' test has been construed as a low threshold, especially for the passion/provocation manslaughter charge. Indeed, if the evidence in the record supports an instruction on passion/provocation manslaughter, the charge should be given whether or not it is consistent with the defense's theory." 376 N.J. Super. 323, 356 (App. Div. 2005), rev'd on other grounds, 187 N.J. 293 (2006) (citations omitted). Moreover, the trial judge, when deciding whether to instruct a jury on passion/provocation manslaughter, should view the situation in a light most favorable to the defendant. State v. Mauricio, 117 N.J. 402, 412 (1990). Thus, a passion/provocation charge is required where "a version, or combination of versions, of the evidence, considered in the light most favorable to defendant," provides a rational basis upon which a juror might conclude that the elements of passion/provocation are met. State v. Taylor, 350 N.J. Super. 20, 40-41 (App. Div. 2002).

Furthermore, when a defendant requests a lesser-included offense charge, strict adherence to the definition of "included" under N.J.S.A. 2C:1-8(d) "is less important . . . than whether the evidence presents a rational basis on which the jury could

13                                                          A-5304-12T3

acquit the defendant of the greater charge and convict the defendant of the lesser." Brent, supra, 137 N.J. at 117. Thus, "[w]hen a lesser-included offense charge is requested by a defendant, . . . the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if the rational-basis standard has been satisfied." Crisantos, supra, 102 N.J. at 278 (citing State v. Powell, 84 N.J. 305, 318-19 (1980)).

Passion/provocation manslaughter is defined as a "homicide which would otherwise be murder . . . [but] is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). It has four essential elements: "the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying." Mauricio, supra, 117 N.J. at 411. "The first two elements constitute the objective standard[.]" State v. Robinson, 136 N.J. 476, 490 (1994). "The third and fourth elements are more subjective because they relate to the defendant's actual response." Ibid. "[A] trial court in charging a jury . . . must find first that the two objective elements of passion/provocation manslaughter are clearly indicated by the evidence." Id. at 491. "If they are, the two

subjective elements 'should almost always be left for the jury.'" Ibid. (quoting Mauricio, supra, 117 N.J. at 413).

"[T]he judge must determine whether a reasonable fact-finder could conclude that the [defendant's] loss of self-control was a reasonable reaction" to the victim's provocation. State v. Viera, 346 N.J. Super. 198, 212 (App. Div. 2001), certif. denied, 174 N.J. 38 (2002). The charge should only be withheld when "no jury could rationally conclude that the State had not proven beyond a reasonable doubt that the asserted provocation was insufficient to inflame the passions of a reasonable person." Mauricio, supra, 117 N.J. at 412.

In this case, defense counsel requested a passion/ provocation manslaughter charge despite the inconsistency of that charge with his assertion that defendant acted in self-defense, and that the shooting was accidental. Defense counsel argued that defendant's own testimony, as well as the testimony of other witnesses, supported the charge. In requesting the charge, defense counsel reviewed with the court each of the four prongs of the passion/provocation model charge and supported his argument for inclusion with the testimony of the defendant and other witnesses.

In particular, defendant contended the charge was warranted based on the adversarial history between himself and Hall, his own testimony that, just prior to the shooting, Hall said to him

"this is the last time you're going to come in this house.  And stop talking to [Lowenstein,]" and his testimony that Hall initially drew the gun.

Furthermore, defendant was charged with knowingly or purposely causing the death of Hall, which was factually supported by Lowenstein's testimony.  Although defendant testified to the contrary, the jury believed the State's witnesses and convicted defendant of that charge.  As the Court recently stated, "by asserting the justification of self-defense, defendant placed the events immediately before the shooting squarely before the jury." State v. Bass, ___ N.J. ___, ___ (2016) (slip op. at 39).  Here, the trial court agreed to charge self-defense, aggravated, and reckless manslaughter.

The prosecutor argued that the record did not support adequate provocation, stating the law "contemplates an acknowledgement by the defendant that there was purposeful conduct on his part[,]" and "[b]ecause this defendant clearly testified he never had his finger on the trigger[,]" the passion/provocation charge was not warranted.  The prosecutor also contended that, "if we give passion/provocation on these facts, it would be hugely misleading to the jury."

The trial court reviewed the facts to determine if there was a rational basis for a passion/provocation manslaughter instruction.  The court concluded, "[i]t's one thing to have

16

self-defense.  It's another to have an accidental shooting. It's another thing to say that someone else is responsible"; they're "inconsistent."  The court noted the inconsistencies in the testimony could lead to jury confusion if the passion/ provocation charge was given, and denied the requested charge.

We disagree with the trial court's conclusion that the evidence did not provide a rational basis to support the elements necessary for a passion/provocation charge.  We recognize "[a]dequate provocation is not satisfied by 'words alone, no matter how offensive or insulting.'"  State v. Docaj, 407 N.J. Super. 352, 368 (App. Div.), certif. denied, 200 N.J. 370 (2009) (quoting Crisantos, supra, 102 N.J. at 274). However, a threat with a gun or a knife may constitute adequate provocation.  Powell, supra, 84 N.J. at 320.  Furthermore, a battery, except for a light blow, has traditionally been considered "almost as a matter of law," to constitute adequate provocation.  Mauricio, supra, 117 N.J. at 414.  In Mauricio, the Court concluded that, where defendant had an altercation with a bouncer, was later forcibly evicted from a tavern, and then shot and killed a person he erroneously believed to be the bouncer some fifteen minutes later, a jury could reasonably find passion/provocation manslaughter.  Id. at 415.

In Crisantos, supra, 102 N.J. at 274, the Court noted the common law rule that "mutual combat" can, in certain circumstances, give rise to passion/provocation mitigation. However, that combat "must have been waged on equal terms and no unfair advantage taken of the deceased," unlike a setting in which the defendant uses a deadly weapon against an unarmed victim. Ibid. (internal quotation marks omitted).

We recognize that, "if a person, under color of fighting on equal terms, kills the other with a deadly weapon which he used from the beginning or concealed on his person from the beginning, the homicide constitutes murder." Id. at 274-275 (citations omitted). However, in this case, the only testimony concerning the origin of the weapon used to kill the victim was defendant's version, and he stated that the victim brought a concealed and loaded handgun to the incident at the home that night.

For provocation to be adequate, it "must be 'sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control.'" Robinson, supra, 136 N.J. at 491 (quoting Mauricio, supra, 117 N.J. at 412). On this score, it has been held "that a threat with a gun or knife might constitute adequate provocation." Mauricio, supra, 117 N.J. at 414. See State v. Pasterick, 285 N.J. Super. 607, 614 (App. Div. 1995); see also Powell, supra, 84 N.J. at 321-22

(defendant's statement that the victim attempted to wrestle the defendant's gun away from him during an argument sufficiently established adequate provocation, even though the defendant had previously given a different story to the authorities); State v. Bonano, 59 N.J. 515, 523-24 (1971) (holding that a verbal threat alone insufficient to reduce the degree of the crime, however, a menacing gesture with the weapon could properly be considered adequate provocation); State v. Blanks, 313 N.J. Super. 55, 72 (App. Div. 1998) (holding history of belligerence and discovery of a long-handled cooking fork on the floor at the victim's side, sufficient to suggest that the victim may have brandished the fork and further provoke defendant); State v. Vigilante, 257 N.J. Super. 296, 301-02, 305-06 (App. Div. 1992) (holding prior history of abuse, threats to kill, and the fact that the victim "bent down to pick up a pipe wrench" all indicated presence of reasonable provocation); State v. Pridgen, 245 N.J. Super. 239, 242-43, 247-48 (App. Div.), certif. denied, 126 N.J. 327 (1991).

Applying these principles to the case at hand, we are satisfied that "a version, or combination of versions, of the evidence adduced at trial, considered in the light most favorable to defendant," provides a rational basis upon which a reasonable jury might make a finding of passion/provocation. See Taylor, supra, 350 N.J. Super. at 40. Both defendant and Lowenstein testified to the history of conflict between

defendant and the victim and Hicks.  By all accounts, a verbal dispute took place, followed by a physical struggle between the defendant and the victim involving a handgun.  The only direct testimony regarding the origin of the handgun came from defendant, who maintained that Hall brought it upstairs with him.

Our dissenting colleague interprets our opinion as relying in large part on the acrimonious history between defendant and victim, and the verbal dispute preceding the shooting.  We acknowledge that mere animosity or verbal sparring alone cannot support a finding of passion/provocation.  We view those facts as secondary to the central issue supporting a passion/provocation charge here: defendant's uncontroverted testimony that Hall withdrew the weapon from his waistband and pointed it at him, thereby threatening him.

We are cognizant of the Court's recent opinion in State v. Funderburg, reaffirming the principle that in considering a sua sponte instruction, appellate courts may not "sift[] through the cold appellate record and construct[] a hypothetical and factually unsupported scenario" in which a jury charge might conceivably be appropriate.  State v. Funderburg, ___ N.J. ___, ___ (slip op. at 10) (2016).  However, this case differs from Funderburg in two important respects.  First, in Funderburg, the defendant argued the trial judge erred by not sua sponte

delivering the jury charge in question.  Ibid.  Here, the judge denied defense counsel's explicit and well-reasoned request for the charge.  Second, unlike in Funderburg, there is factual support in the record for a passion/provocation charge based on "a version, or combination of versions," of the evidence adduced at trial, considered in the light most favorable to defendant.  See Taylor, supra, 350 N.J. Super. at 40.

The facts supporting passion/provocation in this case are neither "hypothetical" nor "unsupported."  It is undisputed that, when Hall entered the kitchen, Lowenstein was "[k]issing and hugging" defendant, with her hands "[a]round his waist."  A verbal dispute ensued between defendant and Hall.  At some point, a gun was produced, escalating the confrontation.  According to defendant's uncontroverted testimony, it was Hall who produced the gun.

The trial judge's task is merely to determine whether the provocation was adequate as a matter of law, and whether, as a matter of law, there was time for the defendant to "cool off."  Viera, supra, 346 N.J. Super. at 212.  If the court determines that the provocation was adequate, and the intervening time was not too long, then it should provide a passion/provocation jury instruction upon request.  Ibid.

The combination of testimony in this case compels the conclusion that the alleged provocation was adequate, and that

the intervening time was short enough that defendant could still have been acting under the influence of that provocation when, moments later, he shot Hall as he lay wounded on the kitchen floor.  It is then for the jury to decide whether defendant was in fact provoked, and whether his passion in fact cooled before he committed the underlying offense.

In sum, we conclude that the evidence adduced at trial provided a rational basis upon which a reasonable jury might make a finding of passion/provocation, and the trial judge was therefore required to give the requested instruction to the jury.  Given our determination that it was error to deny defendant's request to instruct the jury on the lesser-included offense of passion/provocation manslaughter, we need not address the remaining arguments raised.

Reversed and remanded for a new trial consistent with this opinion.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

**GUADAGNO, J.A.D. dissenting**

Little more than a "scintilla of evidence" supporting a charge of passion/provocation manslaughter is required before a jury will be given the option of reducing a murder charge to that lesser-included offense. State v. Crisantos, 102 N.J. 265, 278 (1986). Not even a scintilla of evidence supported defendant's claim that he was entitled to such a charge. Because I believe there was no rational basis to support a passion/provocation charge, I respectfully dissent from the majority decision, which reverses defendant's conviction.

The State and defendant presented two totally antithetical versions of how Jose Hall died on November 7, 2007. The State relied on the testimony of K. Lowenstein, who was sitting at her parents' kitchen table with defendant when Hall entered the room and began a conversation with her. Defendant ordered Lowenstein not to talk with Hall, which prompted an argument between defendant and Hall. Fearing the argument would escalate, Lowenstein left the kitchen to get her parents, who were upstairs. As she walked through the living room, but before she reached the stairs, Lowenstein heard Hall yell "whoa" three times, followed by a gunshot. She turned immediately and ran back to the kitchen to find Hall on the floor curled up in a ball with his legs and arms up in a defensive position, and

defendant standing over him pointing a gun at his head. Ignoring Lowenstein's pleas to let go of the gun and leave the house, defendant aimed the gun at Hall, who was writhing on the floor, and fired a second shot into his head. No reasonable interpretation of the State's version of Hall's killing will support a passion/provocation charge.

Defendant's version is equally bereft of either passion or provocation and asserts unequivocally that he acted solely in self-defense. Defendant claimed that he was kissing Lowenstein in the kitchen when Hall entered the room, went to the refrigerator for food, and began speaking with Lowenstein. Defendant then got up from the table and walked over to Hall. Significantly, neither defendant nor Lowenstein testified that Hall directed any of his remarks to defendant before defendant got up from the table and walked over to Hall. As the majority relies on defendant's version to conclude that he was provoked by passion, I repeat his testimony:

> Q: All right. Now, when you got up, where did you go?
>
> [Defendant]: I got up and I walked over there to [Hall]. And he walked — he just turned around a little bit, about to like step towards me. So, we was face to face talking to each other.
>
> Q: And how were you talking with each other?

[Defendant]: I was talking low. He — he had a little attitude.

Q: Okay. And when he had that little attitude, how did you feel about it.

[Defendant]: We never had a conversation, so I felt it — it - there wasn't no need for that. I was just letting him know, you could tell she didn't want to talk to him. So, I was just letting him know, don't talk to her.

Q: All right. Where did you see [Lowenstein] go?

[Defendant]: When I — when, I got up and I was walking [I] seen her, because she was cleaning a little place right there. And when she — I just seen her from the corner of my eye, she was like, "Well, I'm going to go get my parents." And she just walked and walked out the kitchen.

Q: Okay. And did she leave the room?

[Defendant]: Yeah, I seen her leave the room.

Q: Okay. What, if anything, happened when she left that room?

[Defendant]: She left the room. José looked at me and told me, "[this] is the last time you're going to come in this house. And stop talking to [Lowenstein]." And he pulled out a gun on me.

Q: Where did he pull the gun from?

[Defendant]: From his waistband.

Q: And what did you do?

[Defendant]: I immediately went for it and grabbed his hand.

A-5304-12T3

. . . .

> Q: When you say, "He pulled it out." What did you see him do?
>
> [Defendant]: He just — he reached under his shirt and pulled out a gun. I seen the gun coming out. And I just went for his hand.
>
> Q: When you saw that gun come out, what did you do?
>
> [Defendant]: I grabbed his hand.
>
> Q: And what else.
>
> [Defendant]: I tried to — tried to make sure he doing point it at me. I was pointing it at him, he was trying to point it at me.
>
> Q: What happened?
>
> [Defendant]: The gun went off. We were struggling — we were struggling and the gun went off.

Defendant testified that Lowenstein re-entered the room after the first shot and joined the struggle, during which time the second shot went off. Defendant's assertion is pure self-defense. Nothing in defendant's version suggests that he was provoked or motivated by passion or emotion. Indeed, there was no time for provocation, as defendant claimed he grabbed Hall's arm immediately after Hall drew the gun.

Passion/provocation manslaughter in this case is not only inconsistent with defendant's testimony, it is also inconsistent with the State's version of the homicide, and is unmoored to any

4

record evidence.  As in Crisantos, supra, a jury verdict of passion/provocation manslaughter would have required the jury to reject both defendant's and the State's versions.  102 N.J. at 280.  Neither version of the shooting supports a theory that defendant acted "in a transport of passion . . . induced by an adequate provocation."  Id. at 281 (alteration in original) (quoting State v. Guido, 40 N.J. 191, 209-10 (1963)).

Four elements must be shown to justify a passion/ provocation charge.  State v. Mauricio, 117 N.J. 402, 411 (1990).  First, and most importantly, there must be adequate provocation.  Ibid.  The majority relies on Mauricio for the proposition that a threat with a gun or knife might constitute adequate provocation.  In Mauricio, the defendant was thrown out of a bar by a bouncer on two occasions before he shot an innocent third party, perhaps mistaking the victim for the bouncer who had forcibly ejected him earlier that night.  Id. at 408-09.  The Court held that the provocation produced by the two physical confrontations with the bouncer may have been sufficient to cause the passions of a reasonable person to become so aroused as to result in loss of self-control.  Id. at 414.

Nowhere in this record is there anything approaching the "humiliation at being ejected," which served as the provocation in Mauricio.  Id. at 415.  Accepting defendant's version, the

only possible provocation preceding the shooting came after Hall entered the room and began to speak with Lowenstein. It is fundamental that words alone do not constitute adequate provocation. Crisantos, supra, 102 N.J. at 274. Even if Hall's alleged "last time" statement to defendant can be seen as "insulting or reproachful," it occurred simultaneously as Hall was drawing the gun and does not constitute provocation. See State v. King, 37 N.J. 285, 301 (1962) (suggesting there must be a "time lapse between the utterance of [the alleged insulting remarks] and the commission of the homicide").

The second factor requires that the defendant must not have had time to cool off between the provocation and the slaying. This would negate the effect of the "adversarial history" between Hall and defendant, upon which the majority places great reliance.

The third element is that the provocation must have actually impassioned the defendant. Even accepting defendant's version, he grabbed Hall instinctively attempting to defend himself. He was not motivated by passion. This is precisely the situation where a self-defense instruction is warranted. To require a passion/provocation instruction here would be to blur the line between provocation and fear, render the self-defense instruction superfluous, and confuse the jury. Even under defendant's version, there is no basis for a jury to rationally

conclude that he had been provoked to the point of loss of control.

While this appeal was pending, the Court decided State v. Funderburg, ___ N.J. ___ (2016). Although the majority attempts to distinguish Funderburg, the facts are similar. A romantic triangle involving a woman, Andrews; her current boyfriend, Parham; and her former boyfriend, Funderburg, sparked a confrontation which ended with Funderburg stabbing Parham. Id. at ___ (slip op. at 2). The stabbing was preceded by a "tense relationship" between the two men who had "previously exchanged angry words." Ibid. After Funderburg took Andrews' car keys, he argued with her until Parham intervened. Parham then chased Funderburg, who drew a knife and stabbed Parham. Ibid.

A jury found Funderburg guilty, but we reversed because the trial judge failed to instruct the jury on the lesser-included offense of attempted passion/provocation manslaughter. Id. at ___ (slip op. at 3). On appeal, Funderburg claimed he was entitled to a passion/provocation charge, which he did not request at trial. Id. at ___ (slip op. at 3). The Court reversed and reinstated Funderburg's conviction, finding "there was insufficient evidence in the trial record to indicate that a reasonable person in Funderburg's situation would have been adequately provoked." Id. at ___ (slip op. at 21).

The majority attempts to distinguish _Funderburg_ by noting that defendant, here, requested the passion/provocation charge, while Funderburg argued the trial judge erred by not delivering it sua sponte. However, if Funderburg had been entitled to a passion/provocation charge, the Court would not have affirmed his conviction under any standard of appellate review. In addition, the Court noted that the verbal sparring between Funderburg and Parham, which was far more extensive than the brief exchange in the kitchen between defendant and Hall, did not suggest adequate provocation. _Ibid._ Significantly, the Court noted that even if the jury found the defendant's testimony that Parham initially held the knife to be the most credible, that "would at most support the theory that Funderburg acted in self-defense; it would likely not support a theory that Funderburg was actually impassioned and intended to kill Parham." _Ibid._

Because there was no rational basis to justify a passion/provocation charge under the State's proofs or defendant's version of the shooting, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION